Victor L. George, State Bar No. 110504
Wayne C. Smith, State Bar No. 122535
LAW OFFICES OF VICTOR L. GEORGE
20355 Hawthorne Blvd, First Floor
Torrance, California 90503
Telephone:  (310) 698-0990
Facsimile:     (310) 698-0995
E-mail:        vgeorge@vgeorgelaw.com
               wsmith@vgeorgelaw.com

Attorneys for Plaintiff,
PATRICIA ANNE T. SAMSON

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| PATRICIA ANNE T. SAMSON,<br><br>Plaintiff,<br><br>v.<br><br>WELLS FARGO BANK, NATIONAL ASSOCIATION, a business, form unknown; and DOES 1 through 100, inclusive,<br><br>Defendants. | CASE No. CV-16-04839 GW (AGRx)<br>[Assigned to the Hon. George H. Wu, Courtroom 9D]<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR ATTORNEYS FEES; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>[Filed concurrently with:<br>1. Declaration of Wayne Smith, Esq.;<br>2. Declaration of Stuart Esner, Esq.;<br>3. Declaration of Andrew Chang, Esq.;<br>4. Declaration of Kevin Nguyen, Esq.]<br><br>Date:    March 29, 2021<br>Time:   8:30 a.m.<br>Crtrm:  9D<br><br>Complaint filed: May 20, 2016<br>Trial Date:       March 10, 2020 |

## TABLE OF CONTENTS

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. LEGAL ARGUMENT–PLAINTIFF IS ENTITLED TO LOVG ATTORNEYS FEES IN THE AMOUNT OF $1,628,100 THROUGH TRIAL  BASED ON A LODESTAR RATE OF $ 814,050 AND MULTIPLIER OF 2.0 . . . . . . . . . 3

  A.  The Requested Lodestar for LOVG Should Not be Reduced because both the Lodestar Hourly Rate is Reasonable and the Hours are Reasonable given the Defense Billed 1070 hours compared to Plaintiff's 900 hours . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

  B.  LOVG and ECB are Entitled to Entitled to Their Attorneys Fees in Opposing the JMOL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    1.  The Declaration of Defendant's Purported Expert, Andre E. Jardini, Esq., Should be Rejected as it is Biased, Lacking Foundation and Speculative . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    2.  Alleged Expert Jardini Fails to Offer Probative Evidence of the Plaintiff Side Employment/FEHA Attorneys in the Los Angeles Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    3.  The Defense Claim that Mr. George and Mr. Smith are only Entitled To Lodestars of $600 and $500, Respectively, is Absurd Based on Defendant Counsel's Own Submissions. . . . . . . . . . . . . . . . . . . 6

    4.  Only Plaintiff has Submitted Competent Evidence of the L.A. Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    5.  Plaintiff's Hours Are Reasonable . . . . . . . . . . . . . . . . . . . . . . . . . 9

      a.  "Associate Time" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

      b.  "Excessive Time" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      c.  "Multiple Personnel" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

i

d.    "Overhead" . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

e.    San Francisco Depositions of John Adams and

Phillip Allman Ph.D.. . . . . . . . . . . . . . . . . . . . . . 12

f.    Plaintiff's Expert Jan Duffy . . . . . . . . . . . . . . . . . . 12

g.    Plaintiff is Entitled to the Time Spent Opposing the

Defense JMOL. . . . . . . . . . . . . . . . . . . . . . . . . . 13

C.    Given that a 2.0 Positive Multiplier is Called for, the Argument for

a 50% Negative Multiplier is Insulting and Absurd. . . . . . . . . . . . . . . . 14

1.    A 2x Multiplier is Appropriate . . . . . . . . . . . . . . . . . . . . . . . . 16

2.    A Negative Multiplier is not Appropriate . . . . . . . . . . . . . . . . . . 17

a.    Plaintiff's Claims are all "related" based on a Common

Core of Facts and She Prevailed on the Claims for

Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

b.    There is No Competent Evidence that Wells Fargo Would

have Settled for $500,000 before Trial and the Defense

Blatantly Violated the Mediation Privilege  . . . . . . . . . . . 19

c.    There is No Evidence That Defense Would Ever have Settled

for the Same $500,000 Awarded by the Jury, Exclusive of

Attorneys Fees . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

III.    ECB ATTORNEYS FEES IN THE AMOUNT OF $207,720 . . . . . . . . . . 21

A.    ECB ATTORNEYS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

B.    MSJ APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

C.    POST-TRIAL. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

IV.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

ii

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Bates v. Presbyterian Intercommunity Hospital, Inc.*
    (2012) 204 Cal.App.4th 210 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Beecham v. City of West Sacramento*
    2009 WL 3824793 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Butler v. Homeservices Lending LLC*
    2014 WL5460447 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Callicrate v. Farmland Industries, Inc.*
    139 F.3d 1336, 1340 (10th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*City of Oakland v. Oakland Raiders*
    (1988) 203 Cal.App.3d 78 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Coalition for L.A. City v. Board of Supervisors*
    (1977) 76 Cal.App.3d 241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Crummier v. State of California*
    840 F.Supp.725 (N.D. Cal. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*De La Cruz v. CAL-Pac Sonoma, LLC*
    2013 WL 782283 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Dowd v. City of Los Angeles*
    28 F. Supp. 3d 1019 (C.D. California 2015) . . . . . . . . . . . . . . . . . . . . . . . 18

*EnPalm v. Teitler,*
    (2008) 162 Cal.App.4th . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Flores v. FCRA US LLC,*
    2019 U.S.Dist. LEXIS 1:17-cv-0427-JT . . . . . . . . . . . . . . . . . . . . . . . 1, 13

*Gonzales v. T-Mobile, USA, Inc.*
    2014 WL 4055365 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Graham v. DaimlerChrysler*
    (2004) 34 Cal.4th 553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

iii

**Cases**                                                                  **Page(s)**

*Harris v. Marhofer*

    24 F.3d 16, 19 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Haworth v. Neveda*

    56 F.3d 1048, 1052 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Horsford v. Board of Trustees of California State University*

    (2005) 132 Cal.App.4th 359 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*In re Cal. Public Util. Comm.*

    892 F.2d 778, 781 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*In re Taco Bell*

    2016 WL 3179889 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Johnson v. Univ. College of the Univ. of Alabama*

    706 F.2d 1205 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Ketchum v. Moses*

    (2001) 24 Cal.4th 1122 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3, 14-16

*Lakes v. Bath and Body Works, LLC*

    2018 WL 2318106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Mangold v. California Public Utilities Com'n*

    67 F.3d 1470 (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Michelson v. Camp*

    (1999) 72 Cal.App.4th 955. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Moore v. Jas. H. Matthews & Co.*

    682 F.2d 830, 839 (9th Cir.1982) . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13

*Peak-Los Positas Partners v. Bollag*

    (2009) 172 Cal.App.4th 101. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*PLCM Group, Inc. v. Drexler*

    (2000) 22 Cal.4th 1084 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

iv

**Cases**                                                                                                          **Page(s)**

*Premier Med. Mgmt. Sys., Inc*

    (2103) 163 Cal. App.4th 550 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

*Prison Legal News v. Schwarzenegger*

    608 F.3d 446 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  6

*Rhoades v. Avon Products*

    504 F.3d 1151 (9th Cir. 2007) (9th Cir. 2007)  . . . . . . . . . . . . . . . . . . . . .  20

*Serrano IV*

    (1982) 32 Cal.3d 635 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

*Stathakos v. Columbia Sportswear Company*

    2018 WL 1710075  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Sundance v. Mun. Ct.*

    (1987) 192 Cal.App.3d 268 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

*Taylor v. Long Beach Memorial Hospital*

    2014 WL 1255314 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

*Wing v. Asarco Inc.*

    114 F.3d 986 (9th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17

*Wysinger v. Auto Club of Southern California*

    (2007) 157 Cal. App. 4th 413  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  17


**Codes, Statutes**                                                                                                **Page(s)**

*Evidence Code* §1119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 20

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR ATTORNEYS FEES

## **MEMORANDUM OF POINTS AND AUTHORITIES**

## **I.     INTRODUCTION**

The jury returned its verdict almost a year ago (March 10, 2020) awarding $500,000 in compensatory and punitive damages against a huge, wealthy corporation that continued to wage battle for almost another year. Since then much water has passed under the bridge.

On March 23, 2020, Wells Fargo filed its motion for Judgment as a Matter of Law pursuant to Fed. R. Civ. P. Rule 50 (b) (JMOL) to strike the jury's award of Four Hundred Thousand Dollars ($400,000) in punitive damages. The defense motion was hotly contested and necessitated numerous hearings, briefings and submissions, which in turn necessitated the retention of the appellate firm Esner, Chang & Boyer ("ECB") (appellate counsel responsible for reversing the grant of MSJ on appeal in 2018).  On February 2, 2021 after almost a year of numerous contested hearings, the Court issued its Final Ruling on February 2, 2021, granting the defense motion.

Wells Fargo may have ultimately prevailed on its JMOL but that ignores the reality that trial counsel obtained a difficult punitive damage award, even though it was taken away post trial. Regardless, Plaintiff was still the prevailing so that the fees incurred battling the defense motion are recoverable even if ultimately unsuccessful. *Flores v. FCRA US LLC*, 2019 U.S.Dist. LEXIS 1:17-cv-0427-JT.

The present fee motion was initially filed by Plaintiff on April 8, 2020 with a hearing date of May 20, 2020.  Wells Fargo filed its opposition on April 23, 2020 urging that as a mere single plaintiff case there were fewer damages and it was somehow less deserving under FEHA and was not entitled to either a fair multiplier (2.0) or lodestar.

The hearing on the fee motion was taken off calendar before Plaintiff could file her reply papers.

In its opposition filed on April 23, 2020, if Wells Fargo's argument were accepted, few if any competent lawyers would agree to represent the plaintiffs who need it the most -- those bringing the so-called "single plaintiff" cases which Wells Fargo so blithely trivializes.

1

Without being forced to pay fully compensatory hourly rates and a fair (2.0) multiplier, Wells Fargo would be receiving a windfall, plaintiff Samson and her lawyers would be suffering a significantly unfair loss, and the purposes of the FEHA would be perverted. Wells Fargo's weak rejoinders cannot undercut this central, controlling principle.

For instance, Wells Fargo insists that so-called "single-plaintiff" cases are less important and, therefore, constitute an undesirable sub-market of employment law practice one that demands far lower rates – and thus lower lodestars -- for plaintiff's attorneys seeking fee recovery in contingency cases. (Opp. at 2,8.) Likewise, it baldly asserts that Victor  George's "admission" that he has won multiple million dollar verdicts "gives particular lie to the notion" that he faced any unusual risk in this case. (Opp. at 14.)The facts of this case reveal quite the opposite - a wealthy corporation will battle even relatively modest awards knowing that the next stage of the litigation will be before the Ninth Circuit Court of Appeals!

Far worse than making no sense, these arguments actually fly directly in the face of our Supreme Court's contingency fee jurisprudence and logic. In *Serrano IV*, the Court summarized why *full compensation* to contingency-paid counsel is so essential to the public interest.  It noted the danger that:

> Citizens of ordinary means are unlikely to file, and *competent private practitioners are unlikely to accept*, public interest litigation, however meritorious, without *some assurance* of compensation that *fairly covers* the legal services required.

((1982) 32 Cal.3d at 635, footnote omitted, emphasis added.)

The term "fairly" in this context means matching the hourly rates of comparable practitioners *plus* adding a "premium" on top to compensate for contingent risk and/or other specified factors. . (*Ketchum, supra*, 24 Cal.4th at 1136.) *Ketchum* further explained that adjusting the lodestar figure to provide a fee enhancement reflecting the risk that the attorney will not receive payment:

> [C]onstitutes *earned compensation*; unlike a windfall, it is neither unexpected nor fortuitous. Rather, it is intended to approximate market-level compensation for such

2

services, which *typically includes a premium for the risk* of nonpayment or delay in payment of attorney fees. (24 Cal 4th at 1138, emphasis added.)

In short, denying a fair (i.e. "fully compensatory") multiplier under these circumstances would discourage plaintiff's employment lawyers from taking cases on a contingency fee basis. (*Ketchum, supra*, 24 Cal.4th at 1133.)  Reducing hourly rates – plus denying positive multipliers – in cases that Wells Fargo describes as "low stakes" would absolutely ensure it.

The persons most in need of contingency lawyers are those with economically "undesirable" cases (e.g., small actual damages, problems in proof, etc.)  If lawyers like Victor George were forced to receive inadequate hourly rates and little chance of fair multipliers, they would simply refuse them.

Accordingly, fees related to opposing the extensive post-trial for following the jury verdict (March 10, 2020) has lead to additional attorneys fees which were never presented as part of the initial motion for attorneys fees.  These additional fee requests include Plaintiff's trial counsel (LOVG) additional fees in the **amount of $74,452 incurred** (no multiplier requested) in connection with the post-trial motion, as well as the fees appellate counsel ECB for both the handling of the MSJ appeal and opposing Wells Fargo's JMOL. ECB's fees based on a lodestar of $207,720 without any multiplier. [1]

II.   **LEGAL ARGUMENT–PLAINTIFF IS ENTITLED TO LOVG ATTORNEYS FEES IN THE AMOUNT OF $1,628,100 THROUGH TRIAL BASED ON A LODESTAR RATE OF $ 814,050 AND MULTIPLIER OF 2.0**

A.   **The Requested Lodestar for LOVG Should Not be Reduced because both the Lodestar Hourly Rate is Reasonable and the Hours are Reasonable given the Defense Billed 1070 hours compared to Plaintiff's 900 hours**

The defense team, comprised of four (4) attorneys billed a total of 1070 hours, generating fees of $435,000. (Kaufman Decl., ¶22), whereas Plaintiff's counsel only billed 899.65 hours through trial. Yet the defense urges that the compensable hours should be

---

[1] On February 8, 2021, the Court set the briefing schedule for the hearing on Plaintiff's Fee Motion to allow the Plaintiff to update her fee request in light the post trial hearings.

3

decreased 78.8 hours to a compensable 820.8 hours! (Jardini decl.,¶75).  According to the defense, they are entitled to bill 250 more hours than the Plaintiff.

Defense counsel Kaufman concedes the defense business model bears absolutely no resemblance to the contingency model of Plaintiff's counsel.  Mr. Kaufman  states at length how the existence of EPLI has caused "tremendous rate pressure" on defense firms such that Mr. Kaufman is unable to obtain his "rack" rate of $795 per hour because since 2014 he and Sheppard Mullin have had to agree to discount their hourly rates charged to Wells Fargo in order to obtain their inventory of 100 Wells Fargo cases. (Kaufman Decl., ¶¶ 4-6).  The Law Offices of Victor L. George is not expecting any repeat business for Ms. Samson and should not be measured against a highly-discounted model of 42%.

Mr. Kaufman declares to his belief as to what the defense market charges, ignoring the probability that all its competitors (Littler Mendelson and Ogletree Deakins) work on the same or similar highly discounted business model as Sheppard Mullin. Conspicuously lacking is any professed knowledge of the plaintiff-side of the equation.

**B.    LOVG and ECB are Entitled to Entitled to Their Attorneys Fees in Opposing the JMOL**

Despite the loss of the punitive damage award as a result of close to a year of litigation, Plaintiff is still the prevailing party.

As a result of the time spent opposing the defense JMOL, Plaintiff incurred an additional 81.6 hours, equaling $74,452.  Thus, the **total fees that should be awarded to trial counsel (LOVG) are $1,702,552**.[2]

The requested fees for the  appellate firm of Esner, Chang & Boyer for handling both the successful appeal from the grant of MSJ AND for their work on opposing the JMOL is discussed in **Section III**, but totals $207,120.

---

[2] The additional hours include an additional 31.7 hours by Mr. George (31.7 x $1,050 = $33,285), plus 49.9 hours by Mr. Smith (49.9 x $825 = $41,167) in opposing the JMOL. Together this  equals an additional $74,452 in fees.  Plaintiff's counsel is not seeking a multiplier for post trial work so the total fees sought by trial counsel is $1,702,552.

**1.    The Declaration of Defendant's Purported Expert, Andre E. Jardini, Esq., Should be Rejected as it is Biased, Lacking Foundation and Speculative**

The Defendant has attached the declaration of it's so-called expert, Andre Jardini, Esq.  However, a review of Mr. Jardini's track history reveals that over the years, Mr. Jardini has developed a cottage industry of serving as an expert for the Sheppard Mullin firm when its clients lose at trial and are faced with a fee award.  See, *Taylor v. Long Beach Memorial Hospital* 2014 WL 1255314; *Stathakos v. Columbia Sportswear Company* 2018 WL 1710075;  *In re Taco Bell* 2016 WL 3179889; *De La Cruz v. CAL-Pac Sonoma, LLC* 2013 WL 782283.[3]

**2.    Alleged Expert Jardini Fails to Offer Probative Evidence of the Plaintiff Side Employment/FEHA Attorneys in the Los Angeles Market**

Mr. Jardini bases his opinion on two surveys - his self-prepared Rate Survey Information ("Survey") attached as Exhibit K and USAO Attorneys Fees Matrix attached as Exhibit L (Jardini Decl., ¶¶49, 59).  Neither the "audit" nor the survey are relevant and should be disregarded.

What exactly is the KPC Legal Audit?  What firms found their way into this audit? What type of cases are included (FEHA, business, family, probate, etc)?  What was the methodology of its preparation?  Who knows, it is impossible to tell.

Although the Survey purports to include firms in the "Greater Los Angeles Area", as well as the counties of Orange, San Diego and Santa Barbara, it lacks any information as to what Mr. Jardini is basing his audit on.  Therefore, there is nothing to base his claim of appropriate hourly rates.  See, *PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095 ("The reasonable hourly rate is that prevailing in the community for similar work.").

---

[3] Mr. Jardini claims to have spent the last 15 years as a trial attorney on the plaintiff's side relating to employment matters. (Jardini Decl., ¶7).  However, he fails to state how many FEHA cases he has tried in that time, his hourly rate, or any fee awards, etc.  In fact, a review of his list of trial cases (Exhibit G) shows the last trial that was employment-related, or for the fact *any* trial, was in 2010!  Mr. Jardini also potentially refuses to advise the Court of his hourly rate in the present matter.

5

The USAO Attorney's Matrix fares no better.  It is based on attorneys practicing in the District of Columbia Courts three thousand miles distant!  See, *Prison Legal News v. Schwarzenegger*, 608 F.3d 446, 454 (9th Cir. 2010) ("But just because the Laffey matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away.")

Further, opinions similar to Mr. Jardini's have been the subject of withering attacks as to his methodology and conclusions.  See, Supplemental Pearl Decl. **(Exhibit 1, ¶¶8-16).**

### 3. The Defense Claim that Mr. George and Mr. Smith are only Entitled to Lodestars of $600 and $500, Respectively, is Absurd Based on Defendant Counsel's Own Submissions

In 2015, after it lost at trial, Sheppard Mullin **stipulated** on a fee motion that lead counsel was entitled to an hourly rate of $1,070 and $825 for the second chair counsel. (Pine Decl., Decl.¶ 10).  At no point in its opposition did Wells Fargo deny this fact or respond to this devastating admission.

Thus, it is shocking that in the present case, the Defense argues that Mr. George is entitled to no more than $600 per hour and Mr. Smith is entitled to no more than $500 per hour (even though Mr. George's court-approved lodestar hourly rate has been $950 since 2016 and Mr. Smith's court-approved lodestar hourly rate since 2014 has been $675)!

Moreover, the argument ignores the rates that Sheppard Mullin and its claimed expert regularly request.

In 2014 in *Butler v. Homeservices Lending LLC* 2014 WL5460447, in a FLSA case seeking to recover unpaid wages, Mr. Kaufman opposed a plaintiff counsels' request of lodestars of $600 and $550 per hour, respectively, claiming that in 2014 the market rate for attorneys in Los Angeles and San Diego was $480 per hour - the same rate that he charged his client in the matter. 2014 WL5460447 at 7.

In rejecting the self-serving declaration of Mr. Kaufman, the District Court held:

"Kaufman's statement that he only charged HSL $480/hour to litigate this <u>case carries no weight</u> in light of the evidence Butler provided from disinterested attorneys. Mr. Kaufman is a defense attorney, participated in defending this case, and has defended HSL in some of the other related cases. In the Court's experience, defense attorneys may <u>charge less than plaintiff attorneys</u> who

6

---

work on a contingency fee basis and <u>may offer discounts</u> when defending a client in multiple related cases. Thus, HSL fails to overcome its burden of rebuttal to show how Butler's requested rates are not "in line with the 'prevailing market rate of the relevant community.' " See Carson, 470 F.3d at 891. Therefore, the Court grants Butler's requested hourly rates for Mr. Garrison and Mr. Teeple at $600/hour and $550/hour, respectively.  2014 WL5460447 at 8.

In 2016, in the matter entitled *Erhart v. BOFI Holding Inc*, Case No. 15-cv-2287 - BAS-NLS, Sheppard Mullin represented the defendants and submitted the declaration of one of Mr. Kaufman's partners in connection with a motion for sanctions.  In her declaration, Polly Towill, Esq.,a Sheppard Mullin partner declared:

"Alison N. Kleaver was the lead associate who prepared this motion.  Ms. Kleaver spent over 50 hours researching, preparing and revising this motion, consulting with the forensic computer experts, other associates who provided research assistance and the client, and preparing and revising the supporting declarations and evidence.  Her billing rate for this matter is $555 per hour . . . My Billing rate is $650 per hour." Towill Decl., ¶5 **(Exhibit 2)**

Mr. Jardini, like Sheppard Mullin, is guilty of the same subterfuge of hiding their hourly rates.  In 2010, in the matter entitled *Silva v. Getronics NV*, LASC Case No. BC368049, Mr. Jardini submitted a declaration in support of a class settlement, requesting attorneys fees of $550 per hour. **(Exhibit 3, ¶22).**

A year later in 2011, in *Rafales v. M/S Erodam,* USDC Case No. CV-10-4845 AHM (AJSx), seeking an hourly rate of $675 - an increase of $125 in a year! **(Exhibit 4, ¶31).**

In 2012, Mr. Jardini submitted a declaration in *Augustus v. American Commercial Security Services*, LASC Case No. BC336416, seeking an hourly rate of $753 **(Exhibit 5)**.

In short, **nine (9) years ago** in 2012 Jardini claimed fees of $753 - $153 per hour and $253 per hour more than he declares is the appropriate hourly rate for Mr. George and Mr. Smith, respectively.  Given the intervening eight (8) years one can only assume his hourly rate is over and above the $1050 and $825 sought by Mr. George and Mr. Smith![4]

---

[4] Fee expert Richard M. Pearl, Esq., submitted in 2019 in *Moinuddin v. State of California*, LASC Case No. BC656161, states that, since 2014, firms have been raising their hourly rates 2-5% annually. Pearl Suppl. Decl.,¶ 15

7

This is significant because fee awards are based on the current market rates, not in retrospect when the work was performed. *Graham v. DaimlerChrysler* (2004) 34 Cal.4th 553, 583.

### 4.    Only Plaintiff has Submitted Competent Evidence of the L.A. Market

Not surprisingly, the only competent evidence of the local legal market establishes the $1050 and $825 lodestar requests of Messrs. George and Smith are reasonable. Unlike the Defense the Plaintiff has shown <u>actual awards</u> in FEHA cases in the LA market:

- 2014 - $850 - *Baez v. BUSD*, LASC Case No. BC372092 (DeRUBERTIS, Decl.,¶18)
- 2014 - $850 - *Kuwahara v. Gakuen*, LASC Case No. BC454896 (DeRUBERTIS, Decl.¶18);
- 2015 - **Stipulated** $1,075 for lead counsel and $825 for second chair - *Jones v. Wells Fargo Bank, NA.*, LASC Case No. BC337821 (Pine Decl., Decl.¶ 10)[5];
- 2016 - $950 - *Godinez v. Alta Dena Certified Diary LLC*, USDC Case No. CV 15-01653 RSWL (Ssx) (DeRUBERTIS, Decl.¶18);
- 2016 - $950 - *Mackey v. Helinet*, LASC Case No. BC528671 (DeRUBERTIS, Decl.¶18);
- 2017-$1,100 - *Moland v. McWane, Inc.*, LASC Case No. BC559 (DeRUBERTIS, Decl.¶17);
- 2018 - $1,100 - *Lauren Pinter-Brown, MD. V. Regents of the Univ. Of California*, LASC Case No. BC624838 (DeRUBERTIS, Decl.¶17);
- 2019 - $1029 - Partner; $760 Associate (Supplemental Pearl Decl., ¶12) **(Exhibit 1)**

In addition to these awards to plaintiffs, the evidence establishes the reasonableness of these hourly rates by reference to what partners at defense firms charge:

- Paul Hastings - Partners: (1) Dennis Ellis - $1,275 (2018); $1,200 (2017); $1,100 (2016); $1,050 (2015); (2) Elena Baca - $1,200 (2019); $1,050 (2018); $1,050 (2017); $1,025 (2016); $975 (2015). (DeRUBERTIS, Decl.¶20)

- Paul Hastings - Associates - between 2014-2019 - low $475 to a high of $875. (DeRUBERTIS, Decl.¶20)[6]

---

[5]  Conspicuously absent in both the opposition and in the Jardini declaration is any discussion of the fact that Wells Fargo *stipulated* to the reasonableness of these rates, yet now objects to the lodestar requests of Plaintiff's present counsel.

[6]  In his initial declaration in the *Moinuddin Matter*, Mr. Pearl set forth the partner and associate rates quoted in the text from firms such as Boiles, Schiller & Flexner, Gibson, Dunn & Crutcher, Altshuler Berzon LLP, Arnold Porter LLP, Cooley LLP, Covington & Burling and many others that all support the requested hourly rates. (**Exhibit 6**).

8

### 5. Plaintiff's Hours Are Reasonable

Mr. Jardini has decided to reduce Plaintiff's billings by 135 hours based on his arbitrary definitions of "Associate Time" (58.20); "Excessive" (39.50) and Multiple Personnel (37.50) (Exhibit J).[7]

#### a. "Associate Time"

Under his "Associate" heading Mr. Jardini has arbitrarily decided that 58.2 hours should be charged an "associate" rate of " $350 per hour or less" because he contends Mr. Smith's efforts could be performed by a "competent associate attorney" for a claimed reduction of $11,007.39 (Jardini decl., ¶63)!

Mr. Jardini, who did not review the work performed by Mr. Smith, offers no reason for an hourly rate of "$350 or less" given the fact that he declared that the "average" employment associate in 2017 (not 2020) billed at $397 and the upper 25% billed at $478 per hour (Jardine decl., ¶55).

Presumably, "competent" equates to *at least* an "average" billable rate. In 2017, the "average" hourly rate was $397 and so if Mr. Jardini followed his own methodology, Mr. Smith's "associate" tasks would be $397 per hour that would then have to be upwardly adjusted for the passage of three (3) years.

Mr. Smith, a partner and given his approximately 34 years of practice, skill and training likes to think that at a minimum he can be considered **at least** a "competent" level associate. Moreover, the Judge's opinion not only ignores that in 2014, when she was an associate, Ms. Kleaver was billing Sheppard Mullin clients $550 per hour as an associate **(Exhibit 2),** it also ignores that between 2014 and 2019 other firms billed out their associate time between a low of $475 to a high of $875.

---

[7] By even asserting an "associate" time argument, it reveals Mr. Jardini's defense bias against plaintiff's firms. Jardini assumes that there were even "associates" and "paralegals" who could be assigned to staff at many times, the various files in the office, as opposed to the reality of a small plaintiff's office where, "partners" often (if not always) have to perform all aspects of the litigation.

9

### b.     "Excessive Time"

Mr. Jardini claims to deduct 39.5 hours as "excessive" for the various tasks of preparing the opposition to the motion for summary judgment (86.5 hours)35 hours spent reviewing and providing input for the appellate brief and 34.5 hours preparing the fee motion.[8]  (Jardini Decl., ¶38). Without discussion, analysis, methodology or even a review of the work product Mr. Jardini just, plucks a number out of thin air and deducts 39.5 hours.

### c.     "Multiple Personnel"

Mr. Jardini make an arbitrary decision to deduct 37.5 hours based on "Multiple Personnel" for any pre-trial hearing attended by both Mr. George and Mr. Smith.

Mr. Jardini does not even address why it might be necessary for both trial attorneys to appear at the hearing on a dispositive motion for summary judgment (8 hour deduction); attend a mediation (9 hour deduction) and attend 2 pre-trial conferences where the parties addressed all manner of pre-trial issues including voir dire, number of jurors, in limine motions, verdict form, jury instructions, objections to evidence, witnesses etc. (10.5 hour deduction).

In reality, Mr. Jardini made an arbitrary rule that if two attorneys appeared at a pretrial event, he automatically cut the hours in half. However, both the automatic deduction of half the hours whenever Mr. George and Mr. Smith appeared together, as well as the claim of "excessive time," ignore the fact that the use of multiple attorneys is a well accepted practice. See, *Peak-Los Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 113 (trying cases collaboratively is "completely ordinary practice"); *Premier Med. Mgmt. Sys., Inc* (2103) 163 Cal. App.4th 550,562 ("collaboration does not necessarily amount to duplication"); *Horsford v. Board of Trustees of California State University*, (2005) 132 Cal.App.4th 359, 397 (ordinary practice for experienced counsel to review and edit the same documents); *Johnson v. Univ. College of the Univ. of Alabama* 706 F.2d 1205, 1208 (11th

---

[8]  Although Mr. Jardini claims the hours incurred was "excessive" he admits he cannot opine about either the motion for summary judgment or input on appeal. Jardini decl. ¶41.

10

Cir. 1983) (reductions are warranted "only if the attorneys are *unreasonably* doing the *same* work." (Emphasis in original).

Buried in the morass of Mr. Jardini's slanted, disingenuous and objectionable declaration are two legitimate points concerning approximately 10 hours of time. Therefore, Plaintiff consents to a 6 hour deduction for the attendance of both Mr. George and Mr. Smith at the appellate argument. Additionally, Plaintiff will consent to a 4.5 hours of Mr. Smith in connection with the 4.5 hour billing error regarding the deposition of Dr. Zackler (Opp., pg 11:13-14)

### d.    "Overhead"

The next category is a $900 deduction for what Mr. Jardini claims is overhead. However, what Mr. Jardini fails to acknowledge the actual time entries:

| DATE | DESCRIPTION | BILLED TIME | WRITEN OFF |
|------|-------------|-------------|------------|
| 09/19/2016 | **Receipt, review of and calendar** Δ WFB's Notice of Privacy Rights re Subpoenas to Produce Documents to Dr. Christine Catipou; Dr. David Narang; Dr. John Lim; Dr. Jonathon Solnik; Dr. Oren Zaidel; Dr. Janice Mayeda; Dr. Samuel Miles; Dr. Fe Inocentes; Dr. Deepjot Singh; South Bay Gastroenterology Medical Group | .5 | .25 |
| 01/19/2017 | **Prepare** Second Notice of Continuance of Taking Deposition of Kim Pham | .25 | .25 |
| 02/10/2017 | **Prepare** Third Notice of Continuance of Taking Deposition of Kim Pham and Continuance of Taking Deposition of John Adams | .25 | .25 |
| 06/09/2017 | **Receipt, review of and calendar** Δ WFB's Notice of Deposition of π's Retained Expert Phillip Allman, Ph.D. and Request for Production of Documents; contact Dr. Allman | .25 | .25 |
| 06/09/2017 | **Receipt, review of and calendar** Δ WFB's Notice of Deposition of π's Retained Expert Lester Zackler, M.D. and Request for Production of Documents; contact Dr. Zackler | .25 | .25 |
| 06/09/2017 | **Receipt, review of and calendar** Δ WFB's Notice of Deposition of π's Retained Expert D. Jan Duffy, Esq. and Request for Production of Documents; contact Ms. Duffy | .25 | .25 |

11

| | | | |
|---|---|---|---|
| 10/28/2019 | **Receipt, review of and calendar** Δ WFB's Notice of Privacy Rights re Subpoena to Produce Documents to Dr. Samuel Miles; Dr. Fe Inocentes; Dr. Deepjot Singh; Dr. Lester Zackler; MEDXM Independent Physician Association, Inc.; People 2.0 Global, Inc.; The CSI Companies, Inc., dba Custom Staffing, Inc. | .50 | .50 |

As evident by the task entries the time was spent reviewing the subpoenas that were by defendant.

**e.      San Francisco Depositions of John Adams and Phillip Allman Ph.D.**

These two witnesses, one a percipient witness and the other an expert witness are located in San Francisco.  Unfortunately, travel is dependent on flight times and multiple uncontrollable delays.  These hours are recoverable.

**f.      Plaintiff's Expert Jan Duffy**

The standard to apply is whether a "reasonable and prudent lawyer" would have undertaken the work to "advance or protect [the] client's interest in the pursuit of a successful recovery". See *Moore v. Jas. H. Matthews & Co.*, 682 F.2d 830, 839 (9th Cir.1982).

Accordingly, the appropriate frame of reference is the time the expenses were incurred.  In *Callicrate v. Farmland Industries, Inc.* 139 F.3d 1336, 1340 (10th Cir. 1998), the Court of Appeal held:

> It would therefore be inequitable to essentially penalize a party who happens to prevail on a dispositive motion by not awarding costs associated with that portion of discovery which had no bearing on the dispositive motion, but which appeared otherwise necessary at the time it was taken for proper preparation of the case. We will not, therefore, attempt to employ the benefit of hindsight in determining whether an otherwise taxable item was necessarily obtained for use in the case. Rather, we hold that such a determination must be made based on the particular facts and circumstances at the time the expense was incurred. 139 F.3d at 1340.

See also, *Michelson v. Camp* (1999) 72 Cal.App.4th 955 (non-testifying expert fees recoverable); *Bates v. Presbyterian Intercommunity Hospital, Inc.* (2012) 204 Cal.App.4th 210, 222 ("Although the statute refers to expert witnesses, courts have recognized that

12

'section 998... covers the cost of experts who aid in the preparation of the case for trial, even if they do not actually testify.' (Citation omitted)."

Curiously, Mr. Jardini takes no position on fees incurred with respect to Ms. Duffy's fees.[9]

Defense counsel attacks Ms. Duffy as an "alleged" expert. However, Ms. Duffy's CV includes fifteen (15) pages listing approximately 200 books, videos, articles, public seminars, and academic presentations that Ms. Duffy has written or presented as a management practice expert. The topics run the gamut of the employment field but include topics such as workplace investigations, current employment trends, decisions in the employment area,, human resources responsibilities, corporate whistleblowing, conducting retaliation investigations.

Ms. Duffy's list of trial and/or deposition numbers 220 matters where she has testified as an expert in State and Federal Courts, including *Mackey v. Helinet* LASC Case No. BC528671 in which Shepard Mullin was involved (**Exhibit 7**).

Given her extensive track history as an expert there was nothing "pointless" or frivolous about her designation or deposition. In fact, it was a "reasonable and prudent" to designate Ms. Duffy to "advance or protect [the] client's interest in the pursuit of a successful recovery" *Moore v. Jas. H. Matthews & Co.*,supra.

### g. Plaintiff is Entitled to the Time Spent Opposing the Defense JMOL

Plaintiff anticipates that Wells Fargo will argue that **none** of the time spent opposing the defense JMOL is compensable. Not true. Even *Flores v. FCRA US LLC*, 2019 U.S.Dist. LEXIS 1:17-cv-0427-JT, cited by the defense in its opposition held that preparing an

---

[9] In his Supplemental Declaration, Mr. Pearl notes that in auditing bills, "The standard is reasonableness, not perfection. With 20/20 hindsight, it is easy to identify departures from some theoretical idea of how a project should have been managed. Efforts that appeared to be reasonable at the time may turn out to have been unnecessary . . . Charges are unreasonable only when departures from the norm are persistent, pervasive or substantial." Pearl Supplemental Decl.,¶44.

13

ultimately unsuccessful motion for remand is compensable. There is no basis to refuse to award fees for the unsuccessful JMOL.

## C.  Given that a 2.0 Positive Multiplier is Called for, the Argument for a 50% Negative Multiplier is Insulting and Absurd

Besides its illogic, Wells Fargo's discussion of the multiplier issue is premised on a fundamental falsehood. Wells Fargo contends that no multiplier is appropriate because the "*mere fact* that they faced a risk of recovering nothing (or very little, as they actually did), is not a legitimate basis for a multiplier *in the absence* of other [*Ketchum*] factors not present here." (Opp. at 2, emphasis added.)

That statement is breathtaking. First, any fair reading of *Ketchum* underscores that contingent risk (of receiving little or nothing) is no "mere fact" – rather, it is the single most important factor in any multiplier analysis. The Court pointedly declared that:

> unlike a windfall, [a contingent risk multiplier] is *neither unexpected* nor fortuitous. Rather, it is intended to approximate market-level compensation for such services, which *typically includes a premium for the risk* of nonpayment or delay in payment of attorney fees. (24 Ca.4th at 1138, emphasis added.)

*Ketchum*'s sweeping statement also gives the lie to Wells Fargo's implication that courts are free to refuse contingent risk multipliers willy-nilly. (Opp. at p 13.) While the Court did note that judges are not required to give multipliers, that statement – read in the context of the entire treatment of the need for multipliers – simply is an acknowledgment that in rare cases there might be a strong reason to refuse a contingent "premium" – but this is not "typical."(*Id*. at 1138.)

The second fundamental problem with Wells Fargo's position is that it assumes that the various *Ketchum* factors (contingent risk, difficulty of case, lawyer skill) are *each required* to justify a multiplier. False.

*Ketchum* could not have been more clear that the factors are *disjunctive*. After noting that the basic lodestar may be adjusted by considering the applicability of certain enumerated factors, the Court added:

14

In effect, the court determines, retrospectively, whether the litigation involved a contingent risk **or** required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market rate for such services.

(*Ketchum, supra,* 24 Cal.4th at 1132, emphasis added.)

Besides the foregoing there are other deep holes in Wells Fargo's logic. For instance, while drastically downplaying the importance of contingent risk, Wells Fargo simultaneously elevates other factors that, in reality, are either suspect under *Ketchum* or wholly inapplicable. Consider the alleged absence of "complex[ity]" or high "skill" of the attorneys. (Opp. at 2.) *Ketchum* voiced concern about the propriety of those two factors because of the danger of "improper double counting." (24 Cal.4th at 1138.) It explained that "for the most part, the difficulty of a legal question and the quality of representation are already encompassed in the lodestar" because greater skill will increase the hourly rates of counsel and greater difficulty will increase the number of hours reasonably spent.  (*Id*.)

Moreover, as we discuss elsewhere, Wells Fargo's assertion that this litigation "serves no public interest" and was "mostly unsuccessful" shows that it is oblivious to the public interest policies underlying the FEHA, as opposed to the amount of financial recovery.

Finally, there is one particularly offensive Wells Fargo refrain that we cannot let stand. One formulation of this theme is the statement that "had counsel recovered even half of what they requested from the jury, that contingency would be worth millions. . ." (Opp. at 2.)  But, through no fault of the George firm that did not happen and a contingent interest in the actual recovery here would not come close to covering the huge investment of attorney time and expenses in this action.

Contingent multipliers are necessary precisely to offer protection against those vicissitudes. In total contrast, had Sheppard Mullen suffered a devastating defeat in this action they would still have been *paid in full* for all their time and expenses. Who is the one being greedy?

There is no basis for requesting a negative multiplier in any amount, let alone the 50%

15

requested as that is in consistent with how the legal market place operates. The only reasonable debate is how high the positive multiplier should be, not whether a 50% negative multiplier is proper.

### 1.    A 2x Multiplier is Appropriate

*Ketchum v. Moses* (2001) 24 Cal.4th 1122 makes clear that *unless* a multiplier is used, a contingency attorney will virtually never be *fairly* compensated (compared to his or her hourly-fee counterpart) given boh the great risk of *no payment* at all and the *certainty* that even if payment is received, it will be long-delayed. *Ketchum* expressly holds that:

> "`The experience of the marketplace indicates'" that unless a "'premium'" above the adjusted lodestar is awarded, "'lawyers generally will not provide legal representation on a contingent basis.'" (Id. at 1136, citation omitted.)

As set forth in the moving papers, the risks in taking the case on - and continuing its prosecution after summary judgment was granted -were multiple and intense. They included: a) the fact that Wells Fargo had the resources to "bury" Ms. Samson and the small law firm she had retained in sheer paperwork; b) the ever-present danger of losing the entire case and therefore receiving no fees or out-of-pocket costs; and c) the likely danger of being removed to Federal Court where any verdict would have to be unanimous. The risks inherent in the *unanimous* verdict requirement were exponentially magnified by the fact that the cause of Ms. Samson's termination could have been any one of multiple reasons e.g., over 40 years old, Filipina, female, or medical leave taken. Such cases are extremely hard to win because - even if only a 9-3 vote is needed -- jurors may find that improper motivation was at work but they may disagree about whether the cause was race versus sex or medical leave. In federal court, however, if even one juror disagrees on the true reason underlying the defendant's action, the entire case is lost.

Moreover, there are numerous cases that have awarded a 2.0 multiplier *See*, *Mangold v. California Public Utilities Com'n,* 67 F.3d 1470 (9th Cir. 1995); *City of Oakland v. Oakland Raiders* (1988) 203 Cal.App.3d 78 (trial court's award of 2.34 multiplier affirmed); *Coalition for L.A. City v. Board of Supervisors* (1977) 76 Cal.App.3d 241 (trial court's award of 2.04 multiplier affirmed); *Crummier v. State of California,* 840 F.Supp 719 at 725

16

(N.D. Cal. 1994) (district court's award of 2.0 multiplier affirmed); *Wing v. Asarco Inc*. (9th Cir. 1997) 114 F.3d 986, 989 (district court's award of 2.0 multiplier affirmed.)

In fact, Plaintiff's trial counsel, Mr. George and Mr. Smith, have over the years routinely received a 2.0 multiplier *(Hope v. CYA,* LASC Case No. BC258985 - 2003; *Gee v. Cornerstone*, JW Case No. A1638517 - 2012; *Baez v. BUSD*, LASC Case No. BC372092 - 2014).

Accordingly, a 2.0 multiplier is appropriate.

### 2.    A Negative Multiplier is not Appropriate

#### a.    Plaintiff's Claims are all "related" based on a Common Core of Facts and She Prevailed on the Claims for Retaliation

The Plaintiff prevailed at trial, including convincing the jury per the jury instructions that conduct undertaken by a Wells Fargo managing agent gave rise to an award of $400,000 in punitive damages.  Those damages, although taken away by the Court after almost a year of post trial motions, were the product of exceptional lawyering.  Although, the Court ultimately took those damages away, but only after a multiple hearings, briefings and submissions.  Regardless, the time is still compensable including the requested 2.0.

The Defense, without a single authority, simply argues that a negative multiplier is warranted because "Plaintiff failed on most of her claims" and in classic understatement, barely concedes "there was some intertwining of her claims" for discrimination based on age, gender, nationality and disability/retaliation. (Opp., pg., 15-16:23-17).

No doubt Wells Fargo will urge that after the Court granted its JMOL, Plaintiff's received only "limited success" so that the fees should be reduced  Reductions for "limited success" are disfavored.  In *Wysinger v. Auto Club of Southern California*, (2007) 157 Cal.App.4th 413, the Court of Appeal found that all of the FEHA causes of action were intertwined, concluding that: "But the trial court could find that in proving retaliation Wysinger tried to show why he felt justified in filing the age discrimination claim.  This required proof of his work history and evidence of age discrimination." *Id*. at 431. In fact, the claims were all "related" and **all** the time is compensable.

17

In *Dowd v. City of Los Angeles*, 28 F.Supp.3d 1019 (C.D. California 2015), the eight (8) plaintiffs recovered a **total** of ten (10) dollars for prevailing on their §1983 claims but nevertheless were awarded $601,902.50 in attorney fees despite the loss of other claims. The District Court rejected the identical argument that because the plaintiffs were only "partially successful" the recoverable fees should be apportioned, stating:

> "Analyzed under the standards announced in Hensley and its progeny, Plaintiffs' successful and unsuccessful claims are "related." Plaintiffs' challenges to the 2006 and 2008 Ordinances each addressed the City's attempts to regulate vending and expressive activity on the Venice Boardwalk. Although Plaintiffs' various claims challenged different aspects of the Ordinances, they all relate to a single defendant's efforts to regulate the same type of conduct at the same location. Moreover, each claim raises a First Amendment challenge to the Ordinances. That Plaintiffs proved successful only with respect to the amplified sound ban in the 2008 Ordinance does not negate the common core of facts and legal issues—i.e., the City's regulation of vending and expressive activity on the Venice Boardwalk pursuant to LAMC § 42.15—giving rise to this litigation." 28 F. Supp. 3d at 70.

Thus, all of Plaintiff's claims for discrimination for disability, national origin, age, gender, failure to accommodate, retaliation were based on the same common core of facts and are "related".

Since all of Plaintiff's claims were "related" reducing Plaintiff's attorneys fees based on this other claims would amount to "punishing" an attorney for advocating and ensuring that all potentially viable theories were pursued. See, *Sundance v. Mun. Ct.* (1987) 192 Cal.App.3d 268, 273 ("[A]s a practical matter, it is impossible for an attorney to determine before starting work on a potentially meritorious legal theory whether ot will or will not be accepted by a court years later following litigation. It must be remembered that an award of attorneys' fees is not a gift. It is just compensation for expenses actually incurred in vindicating a public right. To reduce the attorneys' fees of a successful party because he did not prevail on all of his arguments, makes it the attorney, and not the defendant, who pays the cost of enforcing that public right."

Defendants cite to *Harris v. Marhofer*, 24 F.3d 16, 19 (9th Cir. 1994), wherein the plaintiff in that case recovered a paltry $25,000 award and *Beecham v. City of West Sacramento*, 2009 WL 3824793 where the plaintiff was awarded $33,400, unlike the present

18

case where there was a $500,000 judgment, including punitive damages!

Finally, in *EnPalm v. Teitler,* 162 Cal.App.4th (2008), the Court of Appeal did not reach a conclusion that the plaintiff's counsel's fees were properly reduced for engaging in unnecessary litigation, as circumstance not remotely presented in the present case, the Court of Appeal deemed the issue waived because there was no citation to the record.

### b. There is No Competent Evidence that Wells Fargo Would have Settled for $500,000 before Trial and the Defense Blatantly Violated the Mediation Privilege

In a desperate attempt to defeat/diminish the motion for attorney fees, Defendants shockingly resort to unapologetically violating the California's mediation privilege pursuant to *Evidence Code* §1119. Compounding that violation Defendant then mistakenly asserts that FRE 408 controls and cite inapposite case law to improperly claim that Plaintiff could have settled at mediation in 2019 for the same $500,000 it received at trial, exclusive of attorneys fees. (Opp., 16-17:18-20.).

However, there is no evidence to support that claim as the only offer ever made by Defendant was for $15,000 during the December 2019 mediation. Thus, any such claims are false and moreover should be disregarded out of hand for the egregious violation of the mediation privilege.

California *Evidence Code* § 1119 provides in pertinent part:

"Except as otherwise provided in this chapter:

(a) **No evidence of anything said or any admission made for the purpose of, in the course of, or pursuant to, a mediation** or a mediation consultation **is admissible or subject to discovery**, and disclosure of the evidence shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given.

(b) **No writing**, as defined in Section 250, that is prepared for the purpose of, in the course of, or pursuant to, a mediation or a mediation consultation, **is admissible or subject to discovery**, and disclosure of the writing shall not be compelled, in any arbitration, administrative adjudication, civil action, or other noncriminal proceeding in which, pursuant to law, testimony can be compelled to be given. . ."

Paragraph 3 of the Mediation/Confidentiality Agreement provides:

"The mediation is conducted pursuant to California rules of court rules 1630 et seq., California evidence code §§ 703.5, 1115-1128, 1152 and other

19

sections or successor sections of the California evidence code and any federal law." **(Exhibit 8 )**[10]

*Evidence Code* §1119 is iron clad and absolute, even if it operates to preclude evidence of legal malpractice. *Cassel v. Superior Court*, (2011) 51 Cal.4th 113, 118 ("We have repeatedly said that these confidentiality provisions are clear and absolute. Except in rare circumstances, they must be strictly applied and do not permit judicially crafted exceptions or limitations, even where competing public policies may be affected.")

In a diversity action, questions of privilege are controlled by state law. *In re Cal. Public Util. Comm.,* 892 F.2d 778, 781 (9th Cir. 1989). This includes the application of the mediation privilege under *Evidence Code* § 1119, et. seq. *See also*, *Gonzales v. T-Mobile, USA, Inc.* 2014 WL 4055365, pg. 4 (*Evidence Code* §1119 Mediation privilege);*Lakes v. Bath and Body Works,* LLC 2018 WL 2318106, pg. 2 ("Thus, the law of the state of the forum, including its choice/conflict of laws jurisprudence, is the law to be applied to issues of privilege, whether that privilege be at issue during trial or pretrial proceedings.").[11]

**c.      There is No Evidence That Defense Would Ever have Settled for the Same $500,000 Awarded by the Jury, Exclusive of Attorneys Fees**

This case is far different than the cited *Haworth v. Neveda*, 56 F.3d 1048, 1052 (9th Cir. 1995), where the Plaintiff recovered $240,000 **less** than what they could have had by accepting the settlement offer, there had been a rejected Rule 68 offer. (Opp., pg., 17:1-7).

---

[10]  The confidentiality notice in the emails improperly submitted as Exhibit F reads: "This email (including any attachments) is covered by the electronic communications privacy act, 18 U.S.C. 2510-2521, and its contents are confidential and protected from disclosure by the attorney-client privilege, the attorney work product doctrine or other legal privileges . . ."

[11]  The Defense cites *Rhoades v. Avon Products*, 504 F.3d 1151 (9th Cir. 2007) (9th Cir. 2007) (Opp., 16:16-24).  However, that was a case interpreting FRE 408 and **NOT** *Evidence Code* §1119. Moreover, the statements at issue in that case were ancillary to the settlement discussions.  In the present matter the claimed communications were a recap of the settlement discussions and would be protected under FRE 408 (a) (1) making inadmissible any evidence " furnishing, promising, or offering--or accepting, promising to accept, or offering to accept--a valuable consideration in compromising or attempting to compromise the claim."

However, in the present case at no point prior to December 2019 did the Defendants make any settlement overtures - **not a single dime was offered.** In fact, after the grant of summary judgment, the parties were in contact with the appellate mediation office. The parties agreed not to participate in the mediation and to let the appeal run its course because the defense messaged that it valued the case value as low to mid five (5) figures.

Even as late as December 2019 the Defendant was only offering to pay a paltry $15,000.

Finally, in the days leading up to trial there was some "bracketology" discussions that took place, but **no** Defense settlement offer was communicated - let alone a settlement offer of $500,000. (Kaufman Decl., ¶15, pg., 9:4-7). In fact, Wells Fargo rejected Plaintiff's bracket offer of $500,00 to $1 Million.

Hindsight is a wonderful thing, so long as it isn't tainted by "misrecollections." The claim that an offer of $500,000, was made (which would not take into the account the present claim of $1.6 for attorney fees after four (4) years of litigation) is blatantly false as no such offer was **ever** made. (Smith Decl., ¶14).

Meaning, Plaintiff's sole recourse was to prevail both on appeal and then again at trial - which Plaintiff did - and now she seeks an award of attorneys fees in addition to the verdict!

**III.    ECB ATTORNEYS FEES IN THE AMOUNT OF $207,720**

Plaintiff retained the preeminent appellate firm Esner, Chang & Boyer to handle not only the successful appeal from the grant of summary judgment, but also to defend the verdict against the JMOL motion filed by Wells Fargo.

**A.    ECB ATTORNEYS**

**STUART B. ESNER**

Mr. Esner, the founding member of Esner, Change & Boyer, is a certified appellate specialist with almost forty (40) years of appellate experience representing primarily plaintiff-appellants. Mr. Esner graduated magna cum laude from Loyola Law School of Los Angeles in 1982. Following law school, Mr. Esner worked as a law clerk for the Hon. John

21

L. Cole and then a research attorney for the Hon. Eugene McClosky at the Second Appellate District Court of Appeal, Division Four. (Esner Decl., ¶2).

Between 1989 and 2018, Mr. Esner was an adjunct professor at Loyola Law School teaching appellate advocacy.  Mr. Esner, who has handled hundreds of appellate matters in the California Court of Appeals, the Ninth Circuit Court of Appeals and the California Supreme Court, is routinely asked to participate in CLE programs concerning, *inter alia*, appellate representation. Mr. Esner has been selected as a Southern California "Super Lawyer" every year since 2005 and selected in 2007, 2010, 2011, 2016, 2018-2020 as one fo the top 100 lawyers in Southern California. In 2005 he was named the Consumer's Attorney Association of Los Angeles Appellate Lawyer of the year. (Esner Decl.,¶¶ 3-5.)

### ANDREW N. CHANG

Mr. Chang, a certified appellate specialist,  graduated from Hastings College of Law in 1978 where he was a member of the Thurston Society and the Hastings Law Review. Between 1978-1981, Mr. Chang was a civil litigation associate with the firm Pettit & Martin concentrating his practice on appellate and motion matters.  From 1982-1984, Mr. Chang was a research attorney for the California Supreme Court. From 1984-1989, Mr. Chang was an associate at the appellate firm Horovitz & Levy where Mr. Chang elusively practiced appellate law. Between and 1995, Mr. Chang continued his appellate practice at the firm of Kelly, Herlihy & Bane in San Francisco. In 1995, Mr. Chang and Mr. Esner formed Esner, Higa & Chang, the predecessor to Esner, Chang & Boyer. All four partners of ECB are certified appellate specialists and exclusively practice appellate law.(Chang Decl., ¶¶4-5).

Mr. Chang had been named a Northern California Super Lawyer every year since 2007 and was also named the Appellate Lawyer of the year by the  Consumer's Attorney Association of Los Angeles.  Mr. Chang and Mr. Esner were primarily responsible for preparing the briefing in connection with the JMOL filed by Wells Fargo on March 23, 2020. (Chang Decl., ¶¶9-23).

22

**STEFFI JOSE**

Ms. Jose, currently a research for the California Court of Appeal, First District. Prior to joining ECB, Ms. Jose worked at two different civil litigation firms. While in law school, she clerked for the appellate firm Greines, Martin, Stein & Richland, and externed for the Ninth Circuit Court of Appeals Judge Harry S. Pregerson and District Court Judge Terry J. Hatter, Jr. Ms. Jose and Mr. Esner worked together on the appeal from the grant of summary judgment in this case that ultimately was reversed by the Ninth Circuit Court of Appeals.

**KEVIN NGUYEN**

Mr. Nguyen is a 2018 graduate of Loyola Law School, graduating in the top 5% percent and was admitted to the Order of the Coif and Alpha Sigma Nu National Jesuit Honor Society. Mr. Ngyuen has been an associate of ECB since 2019 and has prepared and assisted in approximately 40 appeals, writ proceedings and pre-trial and post-trial proceedings.

**B.    MSJ APPEAL**

| ATTORNEY | LODESTAR | HOURS | TOTAL |
|---|---|---|---|
| STUART ESNER | $700 | 11.5 | $ 8,050 |
| HOLLY BOYER | $700 | 17 | $11,900 |
| STEFFI JOSE | $450 | 67 | $30,150 |
| | | **TOTAL** | **$50,100** |

**C.    POST-TRIAL**

| ATTORNEY | LODESTAR | HOURS | TOTAL |
|---|---|---|---|
| STUART ESNER | $700 | 26.9 | $68,930 |
| ANDREW CHANG | $700 | 126.7 | $88,690 |
| KEVIN NGUYEN | $450 | 129.6 | $58,320 |
| | | **TOTAL** | **$157,620** |

ECB requests a fee award for the post trial work in the amount of **$157,620 in addition to the $50,670 incurred for the MSJ appeal.** The **total** fee request for the two matters is **$207,720.**

23

## IV.    CONCLUSION

For all the foregoing reasons the Court should award LOVG, Ms. Samson trial counsel attorneys' fees the amount of $888,502.50, as well as a 2.0 multiplier ($1,628,100) plus $74,452 (no mulitplier)for post trial work over the last year, for a total of $1,702,552. The Court should also award ECB fees of $207,720 with no multiplier.

Dated: February 12, 2021                  LAW OFFICES OF VICTOR L. GEORGE

                                          */s/ Wayne C. Smith*
                              By: _____
                                          VICTOR L. GEORGE
                                          WAYNE C. SMITH
                                          Attorneys for Plaintiff
                                          PATRICIA ANNE T. SAMSON

24