# EXHIBIT 1

ROB HENNIG (STATE BAR NO. 174646)
BRANDON RUIZ (STATE BAR NO. 264603)
SHOSHEE HUI (STATE BAR NO. 311866)
HENNIG RUIZ & SINGH P.C.
3600 WILSHIRE BLVD, SUITE 1908
LOS ANGELES, CA 90010
TELEPHONE: (213) 310-8301
FACSIMILE: (213) 310-8302

Attorneys for Plaintiff SHEIK MOINUDDIN

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES, UNLIMITED JURISDICTION**

| | |
|---|---|
| SHEIK MOINUDDIN, an individual, | CASE NO. BC656161 |
| Plaintiff, | |
| v. | **DECLARATION OF RICHARD M. PEARL IN SUPPORT OF PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR ATTORNEYS' FEES** |
| STATE OF CALIFORNIA, DEPARTMENT OF TRANSPORTATION, a public entity; and DOES 1-30, inclusive, | |
| | Date Filed:    April 3, 2017 |
| Defendants. | |

DECLARATION OF RICHARD M. PEARL

**<u>DECLARATION OF RICHARD M. PEARL</u>**

1.      I am a member in good standing of the California State Bar. I am in private practice as the principal of my own law firm, the Law Offices of Richard M. Pearl, in Berkeley, California. I specialize in issues related to court-awarded attorneys' fees, including the representation of parties in fee litigation and appeals, serving as an expert witness, and serving as a mediator and arbitrator in disputes concerning attorneys' fees and related issues. On May 14, 2018, I submitted a declaration in support of the motion for reasonable attorneys' fees filed by Rob Hennig of Hennig, Ruiz & Singh, P.C. ["HRS"], Plaintiff's lead attorney (Pearl 5/14/19 Decl."). In that declaration, I rendered my opinion on the reasonableness of the hourly rates his office is requesting in this matter.

2.      I make this Supplemental Declaration in Support of the Plaintiff's Motion for Award of Attorneys' Fees and Costs to respond specifically to the statement and opinions expressed by Defendant's proposed expert witness, Robert Kaufman, with which I substantially disagree.

**MR. KAUFMAN'S OPINIONS ARE BASED ON NON-EXISTENT LEGAL STANDARDS AND A HIGHLY DISTORTED VIEW OF THE FACTS**

3.      I have previously come into contact with Robert Kaufman's declarations opposing fee motions.  From his declarations, it appears that he is primarily a public entity and insurance defense attorney based in Orange County. He does not point to any declarations in which he was retained by a party attempting to obtain fees, nor am I aware of any.

**KAUFMAN'S CHALLENGES TO COUNSEL'S HOURLY RATES ARE SORELY FLAWED**

4.      In my opinion, Mr. Kaufman's opinion as to the reasonableness of the Hennig Ruiz & Singh firm's hourly rates is both legally and factually flawed.  Under California law, Plaintiff's attorneys are entitled to their requested rates if those rates are "*within the range of reasonable rates charged by and judicially awarded comparable attorneys for comparable work.*" *Children's Hosp. & Med. Ctr. v. Bonta [CHMC]* (2002) 97 Cal.App.4th 740, 783 (emphasis added).  As expressed in my May 14, 2019 declaration, in my opinion, the hourly rates requested by Plaintiff's counsel in this matter are well within the range of the non-contingent market rates charged by Los Angeles area attorneys of reasonably comparable experience, skill, and expertise for reasonably comparable services, which is the applicable standard. To support my opinion, my May 14, 2019 declaration set out extensive data on

hourly rates that support the hourly rates requested by Plaintiff's counsel.  It is the very type of data -- prior awards to counsel, prior awards to other comparable attorneys, and the rates stated in court documents by comparable law firms -- that  attorneys requesting  court-awarded fees routinely present to support an opinion regarding the reasonableness of their requested rates. See Pearl, *California Attorney Fee Awards, 3d ed.* (CEB 2010, Mar. 2019 Supp.) (*"Cal. Fee Awards"*), §9.121, pp. 9- 110-119  (listing various methods of proving reasonable rates). That testimony is routinely accepted by the courts as adequate proof of reasonable hourly rates.

5.    Accordingly, in my opinion, the evidence I have presented here  is more than sufficient to support HRS's requested hourly rates.  Far from being "anecdotal," as Kaufman calls it, that evidence – rates awarded by other courts, the rates charged by comparable law firms, and the testimony of highly-qualified counsel – is highly probative. See *Margolin v. Regional Planning Com.* (1982) 134 Cal.App.3d 999, 1005); *United Steelworkers of America v. Phelps Dodge Corp.* (9th Cir. 1990) 896 F.2d 403, 407 ("Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorneys, are satisfactory evidence of the prevailing market rate."). Indeed, my testimony based on similar data has been cited favorably in at least 32 reported decisions, and relied on by countless trial courts. Pearl May 14 Decl.,¶¶ 8-10. It also is my understanding that HRS's requested rates are consistent with the rates they typically charge fee-paying clients., which is another factor supporting my opinion. See *Mandel v. Lackner* (1979) 92 Cal.App.3d 747, 761 ("The value of an attorney's time generally is reflected in his normal billing rate") (internal quotation and citation omitted).

6.    In contrast, Mr. Kaufman's opinion is premised on legal standards for determining hourly rates that are blatantly inconsistent with controlling case law. More specifically, his reliance solely on surveys,  and correlatively on the size of the law firm and on "median" or average"  rates among all types of attorneys, as the controlling factors are wholly inappropriate and inconsistent with California case law, with the legal marketplace, and with the purposes of private attorney general fee-shifting statutes.

7.    Initially, Kaufman's opinion is based primarily on survey data as to all attorneys either in Los Angles or nationwide.  He makes no attempt to differentiate between the experience and skill  of the

attorneys or the reputation of these attorneys – instead using the "median" or "average" rate charged in every data set he submits to this Court.  My testimony, on the other hand, is premised on my opinion that the rates are "within the range" of applicable rates, which takes into account HRS's particular skill and experience; i.e., it is reasonable for more highly-skilled and experienced lawyers to charge rates at the higher end of the applicable range.

8.    In my opinion, applying the correct legal standards, Kaufman's evidence has little if any probative value here. First, Mr. Kaufman's reliance on the size of Plaintiff's attorneys' law firm as a measure of the market value of counsel's work is sorely misplaced.  Under both California and federal fee-shifting law, the size of the prevailing party's law firm does not define the relevant market for statutory fees. See *Building a Better Redondo Beach, Inc. v. City of Redondo Beach* (2012) 203 Cal. App. 4th 852, 872 (rejecting argument that Plaintiff's reliance on national survey improper because survey based on large firm rates); *City of Oakland v. Oakland Raiders* (1988) 203 Cal. App. 3d 78, 82 (affirming trial court award to Raiders' attorney at rates charged by "top law firms in the Bay Area"); *Charlebois v. Angels Baseball LP* (C.D. Cal. 2012) 993 F. Supp. 2d 1109, 1120-1121 (finding large firms, such as Skadden Arps, to be comparable to plaintiff's counsel, a 12-attorney boutique). The measure of hourly rates is the market value of the work, irrespective of firm size.  Likewise, costs, overhead, and the size of the firm have no relevance to the determination of reasonable hourly rates under fee-shifting statutes.  To the contrary, it has long been established that law firm costs and overhead are irrelevant to determining reasonable attorneys' fees.  See *Serrano v. Unruh* (1982) 32 Cal.3d 621, 643 and fn. 40.See  Cal. Rules of Prof. Cond., Rule 1.5 (factors used to determine conscionability of attorney fees do not include size of firm or firm's overhead costs).

9.    Many sole proprietors, small and mid-size firms charge and are awarded rates that are comparable to larger firms' rates – the relevant factors are the attorneys' skill, background, and experience, the type of case, the stakes involved, the nature of the opposition and the like, all of which go to establish the market value of the work. Accordingly, numerous court awards and law firms listed in my May 14 declaration involve similarly small firms. For example, in *The Kennedy Commission v. City of Huntington Beach*, Los Angeles County Superior Court Case No. 30-2015-00801675, Order Granting Petitioners' Motion for Attorneys' Fees Pursuant to California Code of Civil Procedure §

1021.5, filed  July 13, 2016 [1],  the trial court found an $800 hourly rate reasonable for a 36-year attorney at the Public Interest Law Project and a $450 hourly rate reasonable for a six-year attorney at the Public Law Center, both of which are small law firms.  Similar rates also have been found reasonable for attorneys from small law firms in other cases described in my initial declaration. See, e.g., *Nozzi v. Housing Authority* (C.D. Cal. 2018) 2018 U.S.Dist.LEXIS 26049 (finding $850 per hour for a 28-year attorney reasonable, as well as $730 per hour for a 9-year attorney); *Rodriguez v. County of Los Angeles* (C.D. Cal. 2014) 96 F.Supp.3d 990, *affirmed* (9th Cir. 2018) 891 F.3d 779; and *Doe v. United Healthcare Insurance Co., et al.*, No. SACV13-0864 DOC(JPRx) (C.D. Cal.), Order Granting Attorney's Fees and Costs, filed October 15, 2014.  In fact,  even  Kaufman's survey evidence shows that in some fields, the smaller the law firm, the higher the rate that highly-skilled attorneys charge. See Armanino Group Report, p. 12.

10.	Kaufman's premise also has been disproven in recent court awards involving small Los Angeles law firms. For example, in *Wishtoyo Foundation et al v. United Water Conservation District* (C.D. Cal.) 2019 U.S.Dist.LEXIS 39927, the court awarded plaintiffs' small law firms rates of up to $840 per hour for a 32-year attorney and $425 per hour for a fourth-year attorney.

11.	Many of the smaller law firms whose rates I have listed frequently engage in work that is comparable in complexity to this case, and all charge rates for senior attorneys that are comparable or higher than those requested here.  These include: Altshuler Berzon LLP; the Arns Law Firm; Kaye, McLane, Bednarski & Litt ; Rosen, Bien, Galvan & Grunfeld; Schonbrun, DeSimone, Seplow, Harris & Hoffman; and the Law Office of Carol Sobel.

12.	In this case, moreover, HRS's attorneys have excellent "large firm" type backgrounds and are producing work that would be billed at comparable or higher rates in those firms. For example, using Kaufman's Benchmark 4 in the "Labor and Employment Law" category, the *2015* Third Quartile rate for 38 partners from firms with more than 1000 lawyers is $914 per hour; for the 49 associates it is $675 per hour. Adjusted for 2019 at 3 percent a year, the rates are $1,029 for partners and $760 per hour

---

1 The Kennedy Commission fee award was remanded in conjunction with the reversal of the merits. 2017 Cal.App.Unpub.Lexis 7488 (2017).

for associates.[2]  By comparison, the rates requested here are quite modest.

13.     My opinion also takes into account the fact that when smaller law firms like HRS take on difficult but important litigation like the instant case, they frequently litigate against major law firms, or as in this case, attorneys who come directly from such firms.  It makes no sense to award them lower rates, when they have comparable skills, experience, and expertise, and produce work that is equally as good as, if not better than, the work produced by their big firm opponents.

14.     Mr. Kaufman also opines that my May 14 declaration does not focus solely on the rates charged for employment law. This criticism is ironic given Kaufman's frequent use of data as to all attorneys, regardless of whether they are nationwide or in Los Angeles County, whether they litigate complex cases  or are transactional attorneys, or whether they charge market-rates rates or the heavily discounted rates charged to government entities and insurance companies. IN fact, under both state and federal law,  relevant rates are *not* limited to the same "type of case." See, e.g., *Prison Legal News v. Schwarzenegger* (9th Cir. 2010) 608 F.3d 446, 454-455 ("Although the state officials urge us to look only to the rates charged by other attorneys involved in prison litigation, the proper scope of comparison is not so limited, but rather extends to all attorneys in the relevant community engaged in 'equally complex Federal litigation,' no matter the subject matter."); *Shirrod v. Dir., Office of Workers Compensation Program*  (9th Cir. 2015) 809 F.3d 1082, 1090 (same re workers compensation attorneys); *Utility Reform Network v. PUC* (2008) 166 Cal.App.4th 522, 535; *Russell v. Foglio* (2008) 160 Cal.App.4th 653.

15.     Kaufman's reliance on outdated survey data  – some going back to 2014 –does not accurately reflect *current* (2019) attorney rates.  Since 2014, most Los Angeles Area firms have raised their rates by at least 10-15%. Almost all other sources report significant (2-5%) annual rate increases over the past several years.  See, e.g., Simons, *Big Law Should Raise Partner Billing Rates 10+ Percent Now*, The Recorder, Nov. 15, 2018 (attached hereto as Exhibit A) at p. 3 ("In a normal year, partner rates would go up around 5 or 6 percent"); Rozen, *Sorry Clients: Higher Law Firm Billing Rates Really*

2 Kaufman mispresents the Wolters Kluwer data as being from 2016.  Although the report was published in 2016, the data was collected and is for the year 2015.

*Do Pay Off*, The American Lawyer, February 21, 2018 (attached hereto as Exhibit B (average billing rates increasing annually at 3.3% rate nationally, with higher percentages for better performing firms; "[b]illing rates overall have continued a steady climb in recent years, despite pressure from clients on discounts, decreases, and other cost savings"). Although I also cite some older rates, they are to show the progression of hourly rates over the years, not to support applying those hourly rates now as Mr. Kaufman does.

16.     Mr. Kaufman's declaration attempts to discredit the data presented in my initial declaration, calling it "anecdotal" and implying that only rates for attorneys handling employment cases and/or set out in "studies" are relevant. Kaufman Decl., ¶15. Both claims are inconsistent with California and federal law. With respect to declaration testimony about rates, the Ninth Circuit repeatedly has found such evidence sufficient to establish reasonable rates. See, e.g., *United Steelworkers of America v. Phelps Dodge Corp.* (9th Cir. 1990) 896 F.2d 403, 407 ("Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorneys, are satisfactory evidence of the prevailing market rate."); *Kerkeles v. City of San Jose* (2015) 243 Cal.App.4th 88, 96 (citing my declaration); *Cal. Atty Fee Awards*, §§ 9.120 and 9.121, pp. 9-110 – 9-119. The California courts are even more lenient, allowing counsel to support their own hourly rates without supporting declarations or "studies." *Syers Props. III v Rankin* (2014) 226 Cal.App.4th 691, 702 (rates based on claiming attorney's own expertise and opinion). Neither "studies" nor expert testimony are required or favored over other types of evidence.  See, e.g., *Shirrod v Director, supra,* 809 F.3d at 1089 (reversing rate determination where district court relied on national rather than local survey).

**MR. KAUFMAN'S CRITICISMS OF PLAINTIFF'S RATE EVIDENCE ARE UNFOUNDED**

17.     Initially, as an attorney who has practiced complex public interest litigation for almost 50 years and been involved with attorneys' fee issues for 44 of those years, I have prior experience with all of the issues raised in Kaufman's declaration in this matter.   As such, Kaufman's implication that highly-experienced attorneys like Ms. Sobel, Ms. Mizrahi, or myself would take positions we don't believe in just to raise the level of fee awards for our "friends" is both insulting and

inaccurate.  Over my almost 50 years of practice, I have an unblemished record for honesty and integrity; and while not every court has agreed with my opinion, none that I can recall has found me lacking in integrity or ethics or subject to disqualification for bias or any other reason. And, of course, the same criticism, albeit in reverse, could also be said of Mr. Kaufman: that he takes unjustified positions in opposition to fee motions in order to increase his marketability (and profit) with  parties who will pay him to oppose fee motions.  Rather than attack his integrity or  ethics, however, I prefer  to address his opinions on their merits.

18.    I should also add that I have no previous personal or professional relationship with Mr. Hennig or his firm; from our conversations, it is apparent that he retained me solely because of my expertise in the attorneys' fees field, not  because I was a "friend."

19.    Mr. Kaufman also attempts to dismiss my entire declaration based upon his claim that "I always seem to submit declarations in favor of fee requests" (¶ 10a).   Contrary to Kaufman's speculation, I have been retained to consult and/or testify in opposition to fee motions on several occasions, but have turned down most such requests because: a) most prospective fee opponents want an expert who will take positions that I don't believe are correct; and b) such testimony would imperil the contrary positions I have  taken for many of my fee-claimant clients. Mr. Kaufman also claims that none of my data includes employment work and, furthermore, that my review of the market is not limited to Los Angeles County and is not limited to the 2017-2018 time frame.  All three statements are untrue or irrelevant.

20.    First, Mr. Kaufman's claimed "benchmarks" comes from the years 2014-2017. The correct year for assessment of the lodestar rates, however, is not the year the work was performed, but the year  the fee petition is *filed*. See *Graham v. DaimlerChrysler* (2004) 34 Cal.4th 553, 583; *California Attorney Fee Awards*, §9.111, pp. 9-105 – 9-106.1 (listing cases). Mr. Kaufman's claim that the attorney hourly rates for when the work was actually performed is the appropriate measure is not supported by any California authority that I am aware of and appears clearly intended to minimize the hourly rates assessed.  Mr. Kaufman, furthermore, ignores my previous discussion of the basis for using the current rates of the timekeepers included in the fee petition in paragraph 10 – and my citation to

21.    Mr. Kaufman's claim that my data is not limited to the Los Angeles market is only

DECLARATION OF RICHARD M. PEARL

minimally correct. All eleven of the court awards listed in ¶ 14 of my May 14 declaration are from Los Angeles area courts, as is the additional case cited above in ¶ 10 ante. Similarly, all but a handful of the law firms listed in ¶ 15 have offices in the Los Angeles area, and those that don't frequently practice in this forum or in the Central District. Moreover, the rates charged by similarly situated attorneys in the San Francisco Bay Area are comparable to – and in fact generally lower than -- those charged in h the Los Angeles area. Thus, a reasonable rate by San Francisco standards is, by definition, within the range of the Los Angeles area legal marketplace.

22.    Nor does Mr. Kaufman explain why using relevant data from the San Francisco marketplace is somehow less accurate or impermissible than using the Laffey Matrix (one of Mr. Kaufman's claimed benchmarks), which is based on data from the Washington DC market. See ¶¶ 37-40, *infra.*

23.    Mr. Kaufman's claim that I do not include attorney hourly rates for employment law attorneys or work in employment law is plainly both irrelevant and untrue. It is irrelevant because under well-established standards, the applicable market is not limited to employment law case but extends to all litigation of similar complexity. See ¶ 14 above. It also is untrue. For example, I cite to hourly rates in *Garzo v. Metro Services* (Nov. 7, 2017; BC618119) 2017 WL 7058194, at *4, in which the Los Angeles Superior Court awarded $125,000 in attorneys' fees as to employment claims, based on 33% of the gross settlement amount, supported by a lodestar with hourly rates of $450 to $850 per hour. In addition, I have considered *Martinez v. Flying Food Group Pacific Inc.* (Feb. 8, 2018; BC508478; BC569325) 2018 WL 2291094, in which the Los Angeles Superior Court awarded $1,383,333.33 in attorney fees for three firms serving as class counsel in a wage and hour class action, based on 33.33% of the settlement amount and a lodestar cross-check approving the following rates (plus a 1.56 lodestar multiplier) with a paralegal rate of $300 per hour and rates for attorneys from $400 to $825 per hour. In addition, I also considered the three Court Orders cited by Mr. Hennig and included in his declaration: *Luste v. Dr. Jeffrey Tarranto Eyecare, A Professional Optometric Corp.* (Hennig Decl., ¶ 42 and Exh. B); *Luis v. Columbia Sussex, LLC* (*id.*, ¶ 43 and Exh. C); and *Vinson v. County of San Bernardino* (*id.*, ¶ 44 and Exh. D) -- all from 2016 - 2018. These Court Orders are specific to the timekeepers involved in this case and all show that the attorneys' fees requested in this case as consistent with previous Court

determinations of HRS's reasonable hourly rates.  Mr. Kaufman, on the other hand, never addresses the specific fee orders made by this Court in employment law cases or the specific fee orders for HRS's attorneys.

24.    I have also included hourly rates for many firms that practice employment law.  I am familiar with many  Los Angeles firms that practice employment law on the plaintiff's side, including Hadsell, Stormer, Richardson & Renick, and the Litt Firm each with rates of up to $1,000 per hour.  I also am aware of the rates charged by numerous multi-practice commercial firms that include an employment law practice including Jones Day, Latham & Watkins, Munger, Tolls & Olson, ,O'Melveny & Meyers, Orrick Herrington & Sutcliffe, Paul Hastings LLP, Proskauer Rose LLP, Quinn Emmanuel Urquhard & Sullivan, Reed Smith LLP, Ropes & Gray, Rosen, Bien, Galvan & Grunfeld LLP, Sheppard, Mullin, Richter & Hampton, Skadden, Arpr, Slate, Meagher & Flom, and Bird Marella Boxer Wolper Nessim Drooks & Lincenberg. In fact, I represented the Bird Marella firm and others in a fee motion in this Court in 2011 in which rates comparable to those requested here  were awarded, along with a 2.0 lodestar multiplier. See *Molina et al v. Lexmark Inc.*, Los Angeles County Superior Court No. BC 339177, Fee Order filed October 28, 2011,  *aff'd* 2013 Cal.App.Unpub.LEXIS 6684.

25.    I also am informed by Mr. Hennig that HRS has litigated or is currently in litigation against many of the firms that I have cited, including:  Jones Day; O'Melveney & Meyers; Proskauer Rose, LLP; Munger, Tolls & Olsen; Quinn Emanuel Urquhart & Sullivan; Paul Hastings; Reed Smith; and Sheppard, Mullin, Richter & Hampton. The hourly rates charged by these firms, therefore, is relevant to assess HRS's hourly rates for litigating this type of case.

26.    Mr. Kaufman in no way explains why my review of comparable attorneys is not accurate. Instead, the overriding flaw in Mr. Kaufman's analysis is his use of survey data regarding the median or average hourly rates for attorneys generally – sometimes using national data.  None of that data goes to rebut my opinion that the hourly rates requested here are within the range of those charged by and awarded to attorneys with reasonably comparable qualifications for reasonably similar work.

27.    In that regard, Mr. Hennig's high level of experience, skill, and reputation are shown by his declaration.  For example, he has been named a "SuperLawyer" for Plaintiff's Employment Law Litigation for the past five years in a row – a distinction only provided to the top five percent of all

employment law attorneys practicing in Los Angeles. Mr. Kaufman, however, fails to consider Mr. Hennig's reputation, experience or expertise; instead, he looks only to the "median" rates charged by all types of attorneys. It also is ironic that he relies so heavily on median attorney rates when his own criteria demand that both reputation and expertise be considered in determining appropriate hourly rates. The issue is whether counsel's requested rates are "within the range" of those charged by comparably qualified attorneys, not the "average" or "median." *CHMC*, 97 Cal.App.4th 740, 783. On this basis alone, Mr. Kaufman's opinions are faulty.

28. In her declaration, Ramit Mizrahi makes a professional assessment of the reasonableness of HRS's hourly rates given "the education backgrounds, professional experience, and skills of both attorneys [Hennig and Hui]" – something Mr. Kaufman never does. His summary dismissal of Ms. Mizrahi's declaration as biased is hardly a convincing rebuttal of her opinion.

**KAUFMAN'S FIVE "BENCHMARKS" DO NOT UNDERMINE MY OPINION THAT COUNSEL'S REQUESTED RATES ARE REASONABLE**

29. Mr. Kaufman purports to provide five "benchmarks" to determine the hourly rate for Plaintiff's counsel. I have reviewed those "benchmarks" and in my opinion, they are an inaccurate portrayal of Los Angeles area legal marketplace that is relevant here.

**BENCHMARK ONE**

30. Mr. Kaufman cites as "Benchmark One" a 2017 survey from the Armanino Group. Kaufman Dec., ¶ 17. However, his opinion is based upon using several irrelevant factors that he builds into this "Benchmark."

31. First, as set out above, his opinion focuses solely on employment law, when the relevant comparison is to comparably complex litigation of all types. Focusing on employment law distorts the marketplace because it includes attorneys who offer steep discounts for high volume, low-risk work, such as those representing government entities, labor unions, and employers with large volumes of labor-management work. For example, even the Armanino Group's general "Litigation" partner rates are $110 per hour higher at the top end than the "Labor/Employment" rates.

32. Second, Kaufman again focuses on firm size, but as noted above, the use of "Firm Size" is

DECLARATION OF RICHARD M. PEARL

irrelevant under California law.  Kaufman also fails to recognize that when looking at billing rates for all partners/shareholders, the billing rates for small firms (1-10 partners) are higher than for the "all firms", including larger firms listed (11-20, and 21-40). Armanino Report, p. 12.

33.     Third, he continues to use "Average" rates when the more pertinent comparison for HRS's attorneys is to attorneys at the higher end of that range (i.e. the 90th percentile). Civil rights fee-shifting statute like FEHA's will be undermined considerably if the more highly-skilled and successful attorneys can expect only "average" rates when they succeed.

### BENCHMARK TWO

34.     Mr. Kaufman cites as "Benchmark Two" a 2016 survey from the National Law Journal Reporter.  Kaufman Dec., ¶ 19.  He states that for this survey of 30 law firms in Los Angeles County "the average fee rate for attorneys in that study in 2016 was $418.65."  Mr. Kaufman then adjusts that rate to 2018 (but not 2019) to $438.  There are three problems with Mr. Kaufman's analysis.  First, Mr. Kaufman appears to be using a rate for all attorneys regardless of the level of experience -- i.e. it includes both partners and associates of all experience and skill levels. That means he applies the $438 rate across the board to each of the attorney timekeepers.  But, using a single rate for all of the timekeepers goes against all case law describing the applicable standard, which requires a finding for each attorney based on that attorney's particular skill, experience, and reputation.  See *Serrano v. Priest* (1977) 20 Cal.3d 25, 48 ("Fundamental to its determination -- and properly so [23] -- was a careful compilation of the time spent and reasonable hourly compensation of each attorney and certified law student involved in the presentation of the case.")  It also conflicts with his own admonition that the reasonable hourly rate must be determined taking into account the experience, expertise, reputation, and other factors of each individual biller (Kaufman Decl., ¶ 9(a)).

35.     Second, in a previous declaration citing the 2014 version of the NLJ Reporter, Mr. Kaufman stated that partner rates in Los Angeles County were $665 an hour.  Those rates have certainly not gone down.  See Henng Reply Decl., ¶ 110 and Exh. O.

36.     Third, the National Law Journal survey data does not provide a specific hourly rate for complex litigation in Los Angeles County; it is taken from bankruptcy records. It also undercounts Los Angeles rates by not denoting many higher-billing firms, such as  Greenberg Traurig and Quinn

Emanuel as "Los Angeles" firms because their largest offices are elsewhere, even though they are a significant part of the Los Angeles market.

### BENCHMARK THREE

37.     Mr. Kaufman also presents the 2016 USAO Laffey-Matrix (which is based on 2015 rates) as a third "Benchmark". See Kaufman Decl. ¶ 20. The USAO Laffey Matrix is a rate schedule that was created by the United States Department of Justice to reflect what it believes is a reasonable rate for "corresponding legal experience" in Washington, D.C. American Canoe Ass'n, Inc. v. United States Environmental Protection Agency, 138 F.Supp.2d 722, 741 (E.D. Va. 2001). Instead of using the current 2018-19 Laffey schedule, however, Mr. Kaufman appears to be using a 2015 version without any explanation.

38.     In addition, the USAO Laffey Matrix does not differentiate by firm size. Thus, Kaufman's claim that  he is using  Laffey data as to "Firms smaller than 50 lawyers" is simply not true: firm size data is not included in any of the Laffey surveys I have seen.  Nor is it based on Los Angeless area rates; it is based solely on Washington D.C. area rates. In order to obtain a supposed Los Angeles market rate, Mr. Kaufman must somehow adjust this DC rate to the Los Angeles market from the DC market, a very imprecise and  debatable calculation that is generally significantly higher than the adjustment  Kaufman proposes.

39.     Because of these disconnects, the USAO Laffey Matrix has been repeatedly criticized by California courts. See, e.g., *Prison Legal News v. Schwarzenegger*, *supra,* 608 F.3d at 454  ("just because the Laffey matrix has been accepted in the District of Columbia does not mean that it is a sound basis for determining rates elsewhere, let alone in a legal market 3,000 miles away"); *Cruz ex rel. Cruz v. Alhambra School Dist.*, 601 F.Supp.2d 1183 (C.D. Cal. 2009) ("The Court will not apply the Laffey matrix because inter alia it is inconsistent with the standards applicable here requiring that the Court consider the skill and expertise of these particular attorneys in setting their rate."); *Perez v. Cozen & O'Connor Group Long Term Disability Coverage*, No. 05cv0440 DMS AJB, 2007 WL 2142292, at *2 (S.D. Cal. March 27, 2007) (rejecting use of the Laffey Matrix as contrary to Ninth Circuit law, which "instructs district courts to use the rate prevailing in the community for similar work performed by

attorneys of comparable skill, experience, and reputation." (internal quotes omitted) (emphases in original).

40.   In fact, the District of Columbia Circuit Court of Appeals itself, from which the idea for the Laffey Matrix came, has recently rejected the USAO's version of the Laffey Matrix as being an inaccurate measure of marketplace rates. See *DL v. DC* (May 21, 2019) 2019 U.S. App. LEXIS 14963 *19-20. Instead, it has adopted the "LSI Laffey Matrix", which was designed to provide a more realistic view of DC Area rates. See  www.laffeymatrix.com(explaining origins and listing cases that  cite to the LSI version).  A copy of the latest Adjusted LSI Laffey Matrix is attached hereto as Exhibit C. Under that version, the 2018-2019 rates are as follows:

- attorneys with 20 or more years of experience, $894 per hour[3];
- attorneys with 11-19 years of experience, $742 per hour;
- attorneys with 8-10 years of experience, $658 per hour;
- attorneys with 4-7 years, $455 per hour ;
- attorneys with 1-3 years, $371 per hour; and
- paralegals, $202 per hour.

These rates are consistent with the hourly rates requested here. See Hennig Decl., ¶ 3.

**Benchmark Four**

41.   The information presented by Mr. Kaufman as to the Walters Kluwer's survey data also is problematic for the same reasons applicable to Benchmark One: it is restricted to employment law, including attorneys representing government entities, etc; it does not include rates for other types of comparably complex litigation; it fails to differentiate the levels of skill and experience among partners and associates; it differentiates by firm size; and it uses the "average" rates, rather than looking at the

---

[3] In my opinion, I have compared Mr. Hennig attorneys with 20 or more years of experience, given that as I understand it, his academic and legal work while on inactive status with the Bar is more than sufficient to amount to at least an additional year of legal experience.

13
DECLARATION OF RICHARD M. PEARL

"range of rates" charged. It also employs a wholly inadequate adjustment to 2018 rates; Los Angeles area rates have increased by 3-6% annually through *2019*. See ¶ 16 ante.

41.         The Wolters Kluer data used by Kaufman also is from 2015.  That certainly is far less probative here than any more recent reports from Wolters Kleur *e.g.*2016, 2017, or 2018.

**BENCHMARK FIVE**

42. For Benchmark Five, Kaufman uses data from a 2014 article by Frank Strong.  Although this data was not provided by Defendant, it is readily available from an internet search.  From the graph in the article, Kaufman is apparently using the median rate, nationwide, for partners and associates in Labor and Employment law, which he then adjusts to 2018 (not 2019) using an inflation rate of less than 1.5 percent per year.  Again, there is no differentiation by experience, expertise, or skill.  For good reason, such "nationwide" surveys are irrelevant and have been repeatedly rejected. The Strong article is attached as Exhibit D.

43.     To highlight the multiple defects with each "Benchmark," I am including a summary of the faults of each benchmark.  All told, none of the five benchmarks provided are reliable indicators for what the  hourly rates should be here:

14

DECLARATION OF RICHARD M. PEARL

| Unreliability of Benchmark Data | Bench 1 | Bench 2 | Bench 3 | Bench 4 | Bench 5 |
|---|---|---|---|---|---|
| Unjustified Use of Law Firm Size | ✔ | | ✔ | ✔ | |
| Use of Nationwide Sample without Limitation to Los Angeles | | ✔ | | | ✔ |
| Use of all attorneys without regard to any specialization | ✔ | ✔ | ✔ | ✔ | |
| Use of data without differentiating by experience | ✔ | ✔ | ✔ | ✔ | ✔ |
| Use of average or median billing rate at the 50th percentile without justification | ✔ | ✔ | ✔ | ✔ | ✔ |
| Too small a sample size – less than 50 attorneys | ✔ | | | ✔ | ? |
| Failure to use most the most recent survey data available from source | ✔ | ✔ | ✔ | ✔ | ✔ |
| Use of old data adjusted for inflation at less than 2 percent per year | | ✔ | ✔ | ✔ | ✔ |
| Failure to account for quality of work or reputation comparison | ✔ | ✔ | ✔ | ✔ | ✔ |

Averaging the benchmarks, as Kaufman does, to come up with a final proposed hourly rate does not make his unreliable benchmarks more reliable. As one court stated about a similar proposal, "Garbage in, garbage out." *United States v. City & County of San Francisco* (N.D. Cal. 1990) 748 F.Supp. 1416, 1422, *aff'd* in relevant part sub nom *Davis v. City & County of San Francisco* (9th Cir . 1992) 976 F.2d 1536.

### KAUFMAN'S SPECIFIC OBJECTIONS TO COUNSEL'S HOURS ARE OFF-BASE AND SHOULD NOT BE ACCEPTED

44. Plaintiff's counsel have also asked me to respond to Mr. Kaufman's opinions regarding the reasonable number of hours counsel have spent on this matter. Based on my experience and expertise, as well as my prior experience with Mr. Kaufman and other "fee auditors", in my view, Kaufman's opinions here should be given little credence. As an attorney specializing in court-awarded attorneys' fees, I have dealt with numerous so-called "fee auditors;" *i.e.*, attorneys who specialize in reviewing and challenging attorneys' fee claims, generally on behalf of insurance companies,

15

DECLARATION OF RICHARD M. PEARL

government entities, or other parties against whom fee motions have been brought. The correct standard for legal auditors was set out in an article entitled "How to Examine Legal Bills", by Bennett Feigenbaum in 77 J. of Accountancy 84, 86 (1994).  In that article, Mr. Feigenbaum recognized that auditors must defer to the billing judgment of attorneys, within reasonable limits:

> "The standard is reasonableness, not perfection. With 20/20 hindsight, it is easy to identify departures from some theoretical idea of how a project should have been managed.  Efforts that appeared reasonable at the time may turn out to have been unnecessary ….  *Charges are unreasonable only when departures from the norm are persistent, pervasive or substantial.*" (Emphasis added.)

45.    Kaufman's opinion also offends the basic tenet of the Mandatory Fee Arbitration Advisory he cites, which states: **"The vast majority of lawyers are honest and the bills are reliable statements of what was done."**  *See* Arbitration Advisory 2016-02, dated March 25, 2016, available at http://www.calbar.ca.gov/Portals/0/documents/mfa/2016/2016-02_Bill-Padding_r.pdf,  p.  5 (emphasis added).  Yet Kaufman assumes here that Plaintiff's lawyers  are dishonest and unprofessional.  In the instant case, for example, he suggests that "block billing" and other practices inflate the amount of the time actually spent by many  hours, implicitly accusing Plaintiff's law firm of dishonesty or incompetence, when in fact its attorneys are highly-respected, upstanding members of the Bar.

46.    Moreover, unlike a true "auditor," Kaufman never reviews the Plaintiff's attorneys' files or seeks answers from them to questions about their work. Nor does he appear to have known or considered the number of hours spent by *Cal Trans attorneys*, which obviously would be a relevant consideration here but which Cal Trans has refused to reveal.

47.    Instead of a true audit, Kaufman's opinion urges the Court to deny the claiming attorneys compensation for a high percentage of the hours its law firm spent at far lower rates than they request.  With all due respect, his opinions reflect that bias.

**KAUFMAN'S OBJECTIONS TO COUNSEL'S HOURS ARE BASED ON INCORRECT LEGAL STANDARDS**

48.    In my opinion, Kaufman's opinion does not accurately reflect how fees are billed or law is practiced in California, nor does it reflect the correct legal standards applicable to requests for court-awarded attorneys' fees.

49.     **"Block Billing."**  Kaufman opines that Plaintiff's attorneys improperly "block billed"

16

their time.  He claims Hennig block billed for 92.5 hours; 9.25 hours of Hui's time; and 106 hours of Reyes time.  He then claims counsel should not be compensated for  41.55 hours of time they spent, at his proposed reduced rates. Kaufman Decl. ¶ 25. In my opinion, this analysis  is flawed for three reasons.

50.    First, Kaufman does not identify *any* of the specific entries that he claims are block-billed.  Thus, it is impossible to verify or even review Kaufman's findings.

51.    Second, having reviewed the billing entries for Hennig and Hui, the vast majority of the them are not "block billing" under any definition: they relate to the same general task and are entirely adequate for assessing whether the time was reasonably spent.  *See, e.g., Perfect 10, Inc. v. Giganews, Inc.* 2015 US Dist Lexis 54063 (C.D. Cal. 2015) at *80, *affirmed* 847 F.3d 657 (9th Cir. 2017).

52.    Finally, more fundamentally, nothing in California law or practice requires such a penalty for timekeeping practices.  To the contrary, California law does not require detailed time records at all; instead, trial courts have discretion to award fees based on declarations of counsel describing the work they have done and the court's own view of the number of hours reasonably spent. *See, e.g., Raining Data Corp. v. Barrenechea*, 175 Cal.App.4th 1363, 1375 (2009); *Weber v. Langholz,* 39 Cal.App.4th 1578, 1587 (upholding fee award based on counsel's declaration, even though time records and billing statements not provided); *Steiny & Co. v. California Elec. Supply Co.,* 79 Cal.App.4th 285 (2000) (same).  Because detailed time records are not required at all under California law, there is no required level of detail that counsel must achieve.  *See, e.g., PLCM Group, Inc. v. Drexler,* 22 Cal.4th 1084, 1098 (2000) ("We do not want 'a [trial] court, in setting an attorney's fee, [to] become enmeshed in a meticulous analysis of every detailed facet of the professional representation.  It . . . is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps dwarfing the case in chief,'" quoting *Serrano v. Unruh (Serrano IV)* 32 Cal.3d 621, 642 (l982)).

53.    In addition, "block billing" is, in my experience, the prevailing practice among California law firms.  See, e.g,  *Stonebrae, L.P. v. Toll Bros.,* 2011 US Dist.Lexis 39832 (N.D. Cal. 2011) at *29 ("Blockbilling is a typical practice in this district, and blocked-bills have been found to provide a sufficient basis for calculating a fee award"). Over the last several years, I have reviewed the billing records of scores of California law firms, large and small. Most, if not the great majority, of

these firms submit billing records that describe each time keepers' daily activities but provide only a single numerical total for each time keeper's activities that day – so-called "block billing." Such records are accepted both by clients who pay by the hour and by courts that must determine reasonable fees. *See, e.g., Ridgeway v. Wal-Mart Stores, Inc.*, 269 F. Supp. 3d 975, 988 (N.D. Cal. 2017); *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 2016 U.S. Dist.LEXIS 24951, at *309 (N.D. Cal. 2016), adopted in relevant part at 2016 U.S. Dist.LEXIS 88665 ("Having himself recorded time for almost 50 years, the Special Master is aware how silly it is to insist (as insurance companies sometimes do) on showing a specific amount of time on each action taken during a day.").

54. Furthermore, based on my experience, in the great majority of cases, block billing does not impede the determination of whether reasonable hours were spent in most cases because the important issue is how much time was spent on a particular document, phase, or event. *See, e.g., Jordan v. U.S. Dept. of Justic* (D.C. Cir. 1982) 691 F.2d 514, 520. Whether the time spent in a day consisted of 6 hours of drafting and 1 hour of conferring with counsel, or 5 hours of drafting and 2 hours conferring with counsel, makes no difference at all in that determination; different lawyers have different approaches to winning their clients' cases. Similarly, as a practical matter, it is both unduly time-consuming and cost inefficient to interrupt a day spent working, for example, on a summary judgment brief to separately record the time spent on each phone call about the brief, or the time spent actually writing the brief versus time spent on legal or factual research, or the exact amount of time spent on each section of the brief as it is being drafted.

55. Many courts thus recognize that block billing is not automatically suspect or grounds for a fee reduction. *See, e.g., Lunada Biomedical v. Nunez* (2014) 230 Cal.App.4th 459, 487 (block billing challenge rejected because time records were sufficient to allow trial court to determine whether case was overstaffed, how much time was spent on particular claims, and whether time was reasonable); *Nightingale v. Hyundai Motor Am.* (1994) 31 Cal.App.4th 99, 103 ("block billings" acceptable when court can determine that hours claimed were reasonable for tasks described); *United Steelworkers v. Retirement Income Plan* (9th Cir. 2008) 512 F3d 555, 565 (rejecting defendant's arguments that fees should have been reduced for insufficient description and block billing); *O'Bannon v. NCAA,* 2016 U.S. Dist.LEXIS 44131 (N.D. Cal. 2016) at*26 (same); *A.D. v. California Highway Patrol* (N.D.Cal. 2009) 2009 U.S.Dist.LEXIS 110743 ("block billing" summaries "sufficiently describe the tasks performed to

DECLARATION OF RICHARD M. PEARL

enable ...  review of the fee petition"); *Oberfelder v. City of Petaluma* (N.D. Cal, Jan. 29, 2002, No. C-98-1470 MHP) 2002 U.S.Dist.LEXIS 8635 at *9, *aff'd* (9th Cir. 2003) 2003 U.S.App. LEXIS 11371 (block billing "does not undermine the compensability of time reasonably expended where the billing statement meets the basic requirement of listing the hours and identifying the general subject matter of time expenditures").

56.    Kaufman does not explain why a 20% reduction in fees is warranted for block billing. He also fails to acknowledge the revised Arbitration Advisory's express cautionary that despite block billing and depending on the facts, fee arbitrators have the discretion to award 100% of the fee:  "[A]n arbitrator may consider all evidence to determine the propriety of any block billed entry and may conclude, upon due consideration of all such evidence, that the entire time billed is appropriate or some portion is not." Arbitration Advisory 2016-02 at 10.  This is such a case.

57.    Kaufman also opines that the court should not compensate counsel for **61.8 hours** of time  that Hui  did not calculate by the tenth of an hour; of the 523.1 hours spent by Hui, Kaufman would have the court  deduct almost 12 percent of her total time.  This deduction is improper.  As noted above, individual time entries are not required at all under California law.  As I understand it and as Ms. Hui details in her declaration, her time entries are accurate and the total number of hours expended on this case (523.1 hours) is an accurate reflection of the total time she spent working on this case.

58.    **"Conferencing and Review."** Kaufman claims that "Mr. Hennig billed for 154.4 hours, or 31 % of his total billed time, for  "conferencing, and review."  Kaufman then states that he "would allow 20 % of this time for this [work], or 101.1 hours, and deduct the remaining 53.3 hours."  (¶ 25a). Kaufman's statement makes no sense as he is deducting approximately 34.5 % of those hours.  In any event, his deductions are inappropriate:

59.    First, it is impossible to determine what Kaufman regards as "unproductive" conferencing or review.  Because Kaufman does not identify what time entries he regards as inappropriate, it is impossible to review any of the conclusions that Kaufman is reaching.

60.    Second, in my experience, conferencing and review are not only acceptable practices for which to bill clients but in many if not most cases, constitute efficient and effective work. Conferencing promotes efficiency, exchanges of information, and strategy. Most law firms (other than insurance defense firms) routinely bill for two or more attorneys to confer and/or review each other's work, and

DECLARATION OF RICHARD M. PEARL

numerous cases recognize that this practice is reasonable. See, e.g., *Premier Med. Mgmt. Sys., Inc. v California Ins. Guar. Ass'n* (2008) 163 Cal.App.4th 550, 562 ("Collaboration does not necessarily amount to duplication that is not compensable …"). *See also* American Bar Association, Section of Business Law, Task Force on Lawyer Business Ethics, *Statements of Principles* (1995), p. 14 (participation in conferences by multiple attorneys is often necessary and beneficial, and therefore billable to clients).

61.    Third, most of Mr. Hennig's time spent conferencing or reviewing appears to have been in preparation for hearings and trial.  To label this review nonproductive is to ignore the reality of motion and trial practice where such review is, in fact, essential.

62.    **"Duplicative Work."**  Kaufman proposes disallowing time billed by Hennig, Ruiz, Singh, and Hui as duplicative.  Again, this appears to be a computer-generated or otherwise mechanically applied objection, based on the false assumption that two professionals on the same side may never bill for attending the same hearing or working on the same task. That assumption is directly contrary to California practice and California law.

63.    The use of multiple attorneys in hotly-contested litigation is a well-accepted practice, as the courts have recognized.  *See, e.g., Peak-Los Positas Partners v. Bollag* (2009) 172 Cal.App.4th 101, 113 (trying cases collaboratively is "completely ordinary practice"); *Premier Med Mgmt. Sys., Inc., supra* 163 Cal.App.4th 550, 562 ("collaboration does not necessarily amount to duplication"); *Horsford, supra* 132 Cal.App.4th 359, 397 (ordinary practice for experienced counsel to review and edit same documents); *Children's Hosp. and Medical Ctr., supra*, 97 Cal.App.4th 740, 783 (Plaintiff's two principal attorneys "appear to have efficiently divided the work" and had skills and experience that complemented each other); *Johnson v. Univ. College of the Univ. of Alabama* (11th Cir. 1983) 706 F.2d 1205, 1208, *cert. denied* (1983) 104 S.Ct. 489 ("[t]he use in involved litigation of a team of attorneys who divide up the work is common today for both plaintiff and defense work ..."). Accordingly, reductions for duplication are warranted "only if the attorneys are *unreasonably* doing the *same* work." *Id.* (emphasis in original).

64.    Here, I am informed that each of the attorneys performed discrete tasks and there was collaboration and review, not duplication of work.  Generally, tasks were allocated and assigned to those with lower billing rates who could most efficiently handle them.  That practice should be

commended, not faulted, as it generally results in lower overall time charges. In those circumstances, compensation for both is eminently reasonable. See, e.g., *Democratic Party of Washington v Reed* (9th Cir. 2004) 388 F.3d 1281, 1286; *Uniroyal Goodrich Tire Co. v Mutual Trading Corp.* (7th Cir 1995) 63 F3d 516, 525 (presence of more than one attorney at pretrial motions not unreasonable).

65.    **Vague Entries."** Kaufman also claims that some time entries were "vague" and suggests a reduction of time based upon his failure to ascertain what work was performed during that time. For example, he deducts half the time he claims Hui's time records are "vague and ambiguous" or 24.6 hours. (¶ 25e). Again, Kaufman fails to identify the specific time entries he is contesting as to this issue. As noted above, under California law, time records are not even required for counsel to be fully compensated for their work. *See* ¶ 63, *ante*. Even when presented, time records are not required to specify every detail of counsel's work: they need only identify "the general subject matter of [counsel's] time expenditures." *Fischer v. SJB-P.D. Inc.* (9th Cir. 2001) 214 F.3d 1115, 1121. *See, e.g.*, *Jaramillo v. County of Orange,* 200 Cal.App.4th at 830 (time records included very general descriptions, e.g. "trial prep", "T-C Client"); *Ridgeway v. Wal-Mart Stores, Inc.*, 269 F. Supp. 3d 975, 988. They also must be viewed in context,, which both clients and the courts, but not Mr. Kaufman, do. See, e.g., *U.S. v. CCSF*, 748 F.Supp. at 1420.

66.    In my opinion, the HRS time entries are detailed enough to give a court all the information it needs to determine whether, in context, the hours were reasonably expended, which is all that is required. I have reviewed the billing practices of hundreds of attorneys, from sole practitioners to mega law firms. In my opinion, counsel's time records here are at least as descriptive as the majority of time records I have seen. Moreover, in my opinion, they provide all the information required to determine whether counsel's hours were reasonably expended because they allow the Court to assess the amount of time devoted to various tasks and events in the lawsuit.

67.    **"Billing for paralegal work."** **A**gain, because Kaufman does not identify the specific billing entries he seeks to exclude or have billed at a lower rate, it is  impossible to know what entries meet Kaufman's determination that these tasks should have been done by a paralegal. The examples he does give show how over-inclusive this category is: for example, he would reduce compensation for time Mr. Henning spent to "review demonstrative evidence" or "finalize[] trial documents for submission" simply because paralegals also performed this work, when this is precisely the type of

work any lead attorney should and does do.

68.     In my experience, most attorneys perform some paralegal type tasks but are not required or expected to bill such tasks at a lower rate.  See *U.S. v. CCSF*, 784 F.Supp. at 1432. That is in part because it would take more attorney billing time to explain the task and then review the product than to simply do it oneself.

69.     **"Jury deliberations."**  Kaufman excludes all 19.6 hours of time for jury deliberations claiming "Mr. Hennig sat and did nothing."  (¶ 25a).  Claiming time for jury deliberations where an attorney is present, and must respond to multiple jury questions, is common and expected. See, e.g., *County of Riverside v. Rivera* (1986) 477 U.S. 561, 590 (dis. op.) (pointing out that award affirmed by Court includes compensation for time spent awaiting jury).

70.     "**Paralegal time deductions."**  Kaufman deducts over 60 hours of time from the paralegal and law clerk entries.  But again, without seeing which items he claims are "administrative", it is impossible to rebut.

## COUNSEL'S REQUEST FOR A 1.5 (50%) LODESTAR ENHANCEMENT IS MODEST AND REASONABLE.

71.     Based on my knowledge of billing practices and the fees charged and awarded in the Los Angeles legal marketplace, the 1.5 lodestar enhancement (lodestar plus 50%)[4] requested by Plaintiff's counsel is consistent with how fees are billed in that marketplace and therefore reasonable.

72.     An enhancement is an essential consideration in this case:  It addresses the question of how the local legal marketplace compensates attorneys for such non-lodestar factors as contingent risk. *See Graham v. DaimlerChrysler Corp.* (2004) 34 Cal. 4th 553, 579 ("The purpose of [a lodestar] adjustment is to fix a fee at the *fair market value* for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar *in order to approximate the fair market rate for such services*.") Fair market value is precisely the issue here and, in my opinion, the fair market

---

[4] Plaintiff's counsel call the requested multiplier a "0.5" multiplier, but I have always called it a "1.5" multiplier. In any event, it is the same thing: a fee equal to the lodestar *plus* an enhancement equal to 50% of that figure.

DECLARATION OF RICHARD M. PEARL

value of the attorney's fees expended in this case requires at least the requested 1.5 multiplier.

73.     Plaintiff's counsel base their multiplier request on three factors:  1) the contingent nature of any compensation they will be able to receive for this case; 2) the delay in receipt of payment; and 3) the need to further California's public policy  of encouraging skilled counsel to take meritorious cases, particularly  counsel willing to take FEHA cases such as this one through to trial. Each of these aims is consistent with well-established California authority.  See, e.g., *Ketchum v. Moses* (2001) 24 Cal4th 1122,  1133, 1138; *Graham,* 34 Cal.4th at 579.

74.     Kaufman contends, however,  that a contingent fee enhancement  inappropriately double-counts contingent risk and delay in payment.   There is no basis for that opinion.  Both *Ketchum* and *Graham* recognize that these are separate factors. A contingent risk multiplier must be considered in every contingent fee case where  there is the real risk of non-payment at all due to the possibility of losing; that is how the legal marketplace works. See *Ketchum*, 24 Cal.4th at 1132, 1138. Caltrans consistently argued that Moinuddin was never discriminated or retaliated against but instead was properly fired – as supported by the SPB decision. Given  Caltrans's arguments, there was a significant risk of a defense verdict in its entirety.  Delay in payment as to payment for work (now over two years' time) is a separate factor.  Normal attorney billing practices  expect full payment based on monthly bills for all work done in that month.  The delay in payment is for the delay that is now continuing to accrue in payment of these fees.

75.     Nor do I agree with Kaufman's claim that  a negative multiplier should be applied. The negative SPB ruling was known at the time of filing in this case and made the risk in this case far greater than in other cases.  The lack of success at trial, instead, may be viewed as a considerable success in obtaining a jury verdict of both discrimination and retaliation, as well obtaining injunctive and declaratory relief that will require Caltrans  to correct these unlawful practices. A negative adjustment is simply inconsistent with how the legal marketplace would operate in those circumstances.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 10, 2019 at Berkeley, California.

DECLARATION OF RICHARD M. PEARL

Richard M. Pearl

DECLARATION OF RICHARD M. PEARL

**EXHIBIT A**

Case 2:16-cv-04889-GW-AGR   Document 181-2   Filed 02/12/21   Page 28 of 40   Page ID #:6162

# THE**RECORDER**

NOT FOR REPRINT

🖨 Click to print or Select '**Print**' in your browser menu to print this document.

Page printed from: *https://www.law.com/therecorder/2018/11/15/big-law-should-raise-partner-billing-rates-10-percent-now/*

# Big Law Should Raise Partner Billing Rates 10+ Percent Now

It's critical to the long-term viability of Big Law that partners delegate more and that firms re-balance where margin is generated; raising partner rates aggressively will help with both

By **Hugh A. Simons** | November 15, 2018

We're close to a peak of the business cycle. Client businesses are performing strongly; they can afford aggressively-increased partner billing rates. But the logic for raising rates strongly now is more than just opportunism; it's about Big Law's long-term viability. For firms to remain prosperous two things must happen: partners must delegate more and firms must re-balance where they generate margin (i.e. profit) from more junior to more senior lawyers. Raising partner rates aggressively now will help on both these fronts.

On delegation, let's start with two observations. First, clients have been taking work away from Big Law and doing it in-house (or through lower-cost providers) because so doing saves money. This shifting will intensify as the new breed of more-capable in-house lawyer (see Figure 1) takes not just more work, but more high-end work, away from outside counsel. Second, more than half the hours partners bill (in many cases, well more than half) are for work that could be done by a lawyer with a lower billing rate. These observations connect: getting partners to delegate more will lower total client charges which is vital to Big Law stemming the contraction of market demand. As an aside I use 'delegate' not 'leverage' here deliberately: when partners hear 'leverage' they think they have to add more

associates to their matters; by using 'delegate' I hope for partners to hear that instead of their doing an hour's work, they have an associate do it.

The connection between delegation and partner billing rates isn't entirely obvious but it's real. Many partners recognize that much of the work they do is not true partner-level work. Hence, they are wary about charging full partner billing rates; but rather than delegating (as they should), they appease their conscience by shaving a little off their billing rates. Despite this



back-pressure, the failure to delegate results in unnecessarily-increased client fees and also denies associates learning opportunities and disinclines partners from doing that which they should be doing, i.e. going out and finding more high-quality work. Raising partners' billing rates assertively will push back on this dynamic, increase delegation, lower fees, and thus help stem the contraction in market demand.

On the issue of re-balancing where margin is generated, let's again start with two observations. The first is that, over time, technology will continue to reduce the demand for junior lawyer time relative to that of senior lawyers. The second is that today's billing rates generate higher margin on junior lawyer time than on senior lawyer time. To see this latter, take a look at the amount by which billing rates exceed compensation (converted to an hourly equivalent) by lawyer cohort. What you'll find is that billing rates are 4.5 to 5.0 times compensation for junior associates and only 3.5 to 4.0 times compensation for senior associates and counsel. Again, linking the two observations: Big Law is on a path to see margins and profitability diminish as technology continues to erode the demand for junior lawyer time.

Big Law's margin structure is befuddling. It is inverted relative to all other businesses—all others charge a higher mark up on their higher-value products—e.g. in the rag trade, the

mark up on *haute couture* is much higher than that on *prêt-à-porter* (ready-to-wear). The inversion is the cumulative effect of many years of raising associate rates more than partner rates while being careful not to let senior associate and counsel rates come too close to junior partner rates. Clients are instinctively aware of the nonsense that associate billing rates have become; that's why they say they see the value in partner billing rates but balk at the junior associate rates. The truly weird part is that Big Law's wacky billing rate structure is entirely of its own making. Clients care greatly about the total fee charged; they care little about how that total is arrived at in the law firm's billing system.

To change this profitability trajectory, Big Law needs to raise partner billing rates aggressively so that the billing rates of senior associates and counsel can rise so that, in turn, the greater margin earned on the time of these more senior lawyers can offset the loss of margin through diminished demand for junior lawyer time. This cannot be done overnight. But it must be done at a pace equivalent to that of technology's erosion of junior lawyer demand, and it must begin now as Big Law's billing rates are already behind the curve.

In a normal year, partner rates would go up around 5 or 6 percent. Continued increases at this rate won't fix the problem. Rates must go up more especially in years where client businesses are performing strongly. Thus, this year partner rates should go up by 8 to 10 percent, and by more for the most sought-after partners in the busiest practices.

It's rare in Big Law that opportunity aligns with pressing needs. But now is such a time. The opportunity is created by the business cycle; the needs are to increase delegation and re-balance where margin is generated. It's an opportunity not to be missed.

Hugh A. Simons, Ph.D., is formerly a senior partner and executive committee member at The Boston Consulting Group and chief operating officer at Ropes & Gray. He writes about law firms as part of the ALM Intelligence Fellows Program. He welcomes readers' reactions at HASimons@Gmail.com (mailto:HASimons@Gmail.com)

**EXHIBIT B**

# LAW.COM

**NOT FOR REPRINT**

🖶 Click to print or Select '**Print**' in your browser menu to print this document.

Page printed from: *https://www.law.com/2018/02/21/sorry-clients-higher-law-firm-billing-rates-really-do-pay-off/*

# Sorry Clients: Higher Law Firm Billing Rates Really Do Pay Off

An analysis by Citi Private Bank's Law Firm Group shows the advantage of aggressively raising published billing rates.

By Miriam Rozen | Originally published on <u>The American Lawyer (/americanlawyer)</u> | February 21, 2018

Law firms do better when they raise their published billing rates at a faster clip, even if those increases result in a widening gap between published and realized rates, according to a recent analysis by Citi Private Bank's Law Firm Group.



**Credit: Sergey Nivens — Fotolia**

"The analysis we have is how the consistently most successful firms have increased rates versus the broader industry during 2010-17," explained <u>Gretta Rusanow (https://www.law.com /americanlawyer/sites/americanlawyer/2018/02/07/citi-report-strong-fourth-quarter-pushes-2017-financials-past-2016-results/)</u>, head of advisory services for the group.

Top-performing firms increased their rates at an average annual rate of 4.4

percent, compared with an increase of 3.3 percent for the broader sample, Rusanow said in an email. While those top performers saw a wider gap between their published and realized rates, their realized rates nonetheless grew faster than at the other, less aggressively priced firms.

At top-quartile law firms—grouped by Citi based on profitability, contribution per lawyer averages and net income margins—"realized rates grew at an average annual rate of 3.5 percent, compared to 2.8 percent for the broader industry," Rusanow said.

"The key takeaway," according to Rusanow: Firms continued to increase published rates while taking deeper discounts. That's how the top echelon of firms "widened their rate advantage."

The trend persisted in 2017. Citi's most recent survey of law firm performance (https://www.law.com/americanlawyer/sites/americanlawyer/2017/12/14/in-2018-law-firms-will-face-greater-challenges-than-slow-growth/) showed that for the most successful firms, published rates increased 5.6 percent, versus 4.2 percent for the broader sample. At the same time, realization rates increased 5.7 percent for the most successful firms, versus 2.9 percent for the broader sample, Rusanow said.

Billing rates overall have continued a steady climb in recent years, despite pressure from clients insisting (https://www.law.com/americanlawyer/almID/1202749147696/) on discounts, decreases and other cost savings (https://www.law.com/americanlawyer/sites/americanlawyer/2017/11/14/no-pain-no-gain-for-law-firms-as-client-demands-get-more-extreme/).

For law firm consultant Janet Stanton of Adam Smith Esq., the Citi analysis confirms that the elites have a built-in advantage.

"This is more of the same," Stanton said. "There has been a pulling away of firms with a stronger performance. To me it also says something about the greater value of brand strength."

**EXHIBIT C**

# LAFFEY MATRIX

History

Case Law

Expert Opinions

See the Matrix

Contact us

Home

Links

| Year | Adjustmt Factor** | Paralegal/ Law Clerk | Years Out of Law School * | | | | |
|------|------|------|------|------|------|------|------|
| | | | 1-3 | 4-7 | 8-10 | 11-19 | 20 + |
| 6/01/18- 5/31/19 | 1.0350 | $202 | $371 | $455 | $658 | $742 | $894 |
| 6/01/17- 5/31/18 | 1.0463 | $196 | $359 | $440 | $636 | $717 | $864 |
| 6/01/16- 5/31/17 | 1.0369 | $187 | $343 | $421 | $608 | $685 | $826 |
| 6/01/15- 5/31/16 | 1.0089 | $180 | $331 | $406 | $586 | $661 | $796 |
| 6/01/14- 5/31/15 | 1.0235 | $179 | $328 | $402 | $581 | $655 | $789 |
| 6/01/13- 5/31/14 | 1.0244 | $175 | $320 | $393 | $567 | $640 | $771 |
| 6/01/12- 5/31/13 | 1.0258 | $170 | $312 | $383 | $554 | $625 | $753 |
| 6/01/11- 5/31/12 | 1.0352 | $166 | $305 | $374 | $540 | $609 | $734 |
| 6/01/10- 5/31/11 | 1.0337 | $161 | $294 | $361 | $522 | $589 | $709 |
| 6/01/09- 5/31/10 | 1.0220 | $155 | $285 | $349 | $505 | $569 | $686 |
| 6/01/08- 5/31/09 | 1.0399 | $152 | $279 | $342 | $494 | $557 | $671 |
| 6/01/07-5/31/08 | 1.0516 | $146 | $268 | $329 | $475 | $536 | $645 |
| 6/01/06-5/31/07 | 1.0256 | $139 | $255 | $313 | $452 | $509 | $614 |
| 6/1/05-5/31/06 | 1.0427 | $136 | $249 | $305 | $441 | $497 | $598 |
| 6/1/04-5/31/05 | 1.0455 | $130 | $239 | $293 | $423 | $476 | $574 |
| 6/1/03-6/1/04 | 1.0507 | $124 | $228 | $280 | $405 | $456 | $549 |
| 6/1/02-5/31/03 | 1.0727 | $118 | $217 | $267 | $385 | $434 | $522 |
| 6/1/01-5/31/02 | 1.0407 | $110 | $203 | $249 | $359 | $404 | $487 |
| 6/1/00-5/31/01 | 1.0529 | $106 | $195 | $239 | $345 | $388 | $468 |
| 6/1/99-5/31/00 | 1.0491 | $101 | $185 | $227 | $328 | $369 | $444 |
| 6/1/98-5/31/99 | 1.0439 | $96 | $176 | $216 | $312 | $352 | $424 |
| 6/1/97-5/31/98 | 1.0419 | $92 | $169 | $207 | $299 | $337 | $406 |
| 6/1/96-5/31/97 | 1.0396 | $88 | $162 | $198 | $287 | $323 | $389 |
| 6/1/95-5/31/96 | 1.032 | $85 | $155 | $191 | $276 | $311 | $375 |
| 6/1/94-5/31/95 | 1.0237 | $82 | $151 | $185 | $267 | $301 | $363 |

The methodology of calculation and benchmarking for this Updated Laffey Matrix has been approved in a number of cases. See, e.g., McDowell v. District of Columbia, Civ. A. No. 00-594 (RCL), LEXSEE 2001 U.S. Dist. LEXIS 8114 (D.D.C. June 4, 2001); Salazar v. Dist. of Col., 123 F.Supp.2d 8 (D.D.C. 2000).

* "Years Out of Law School" is calculated from June 1 of each year, when most law students graduate. "1-3" includes an attorney in his 1st, 2nd and 3rd years of practice, measured from date of graduation (June 1). "4-7" applies to attorneys in their 4th, 5th, 6th and 7th years of practice. An attorney who graduated in May 1996 would be in tier "1-3" from June 1, 1996 until May 31, 1999, would move into tier "4-7" on June 1, 1999, and tier "8-10" on June 1, 2003.

** The Adjustment Factor refers to the nation-wide Legal Services Component of the Consumer Price Index produced by the Bureau of Labor Statistics of the United States Department of Labor.

**EXHIBIT D**

Case 2:16-cv-04839-GW-AGR   Document 181-2   Filed 02/12/21   Page 38 of 40   Page ID #:6172

Search...   Q



## LexisNexis | Business of Law Blog

Software solutions for the business of law and litigation

Small Law    Large Law    Corporate Counsel    About Us    Author Bios

Home » Corporate Counsel » What are the Going Law Firm Rates by Practice Area?

# WHAT ARE THE GOING LAW FIRM RATES BY PRACTICE AREA?

Posted by: Frank Strong   August 7, 2014   in Corporate Counsel   1 Comment

What rates can corporate counsel expect to spend for outside counsel by practice area? The chart nearby, while complex at first glance, encompasses an enormous amount of data with an at-a-glance view of what the going rates are for legal services by practice area in United States.

The data stems from our latest trends report which was released this past Tuesday by the CounselLink team. The data contained is through the year-end of 2013 and includes some $15 billion in total spending.

### SOCIAL

🔊 f 𝕐 in

### FEEDBURNER WIDGET

Subscribe to our email newsletter.

Enter your e-mail address

Subscribe

### NEW TRENDS REPORT



### CASEMAP CASE STUDY



### PCLAW CASE STUDY



*Download the **Complete Complimentary Report***
Enterprise Legal Management Trends Report



"PCLaw® won't let you screw up. There's no possibility of making a mistake."

## How to Interpret the Chart

The full report contains this guide for interpreting the chart:

> *The chart captures median rates for three different groups of timekeepers (partners, associates and paralegals) and the range of the blended average rate across multiple matter types. As a guide to interpreting the output, consider IP-Trademark compared to Mergers and Acquisitions. These two categories have the highest median rates for Partners – $500 and $440, respectively – but IP-Trademark work requires significantly less partner time. The result is a noticeably lower blended median rate for IP-Trademark work versus the same rate for Mergers and Acquisitions.*

Volatility of rates:

> *An additional metric provided in this section is the Volatility Index – a calculated marker indicating the variability encountered in blended matter rates. Using a 10-point scale, the Index reflects how broad the spread is between the 25th and 75th percentiles of hourly rates. High volatility scores indicate greater variance in prices paid based on the mix of timekeepers and individual hourly rates*

## Example of Interpretation

If we look at the first example, the M&A practice we can see the total blended fee rate ranges from just under $200 per hour to about $650 for a partner. The colored hash marks – green for partner, purple for associate and blue for paralegal – provides the media rate per hour at those respective levels.

For example, the green hash mark under M&A indicated the median partner rate is just shy of $450 per hour. Overall, rates in this practice are have a volatility of 6 on a 10 point scale, where 1 has the least volatility (see insurance for example) and 10 is most volatile.

The chart provides a useful benchmark for comparing rates and the complete report is contains several other benchmark metrics for looking at legal spend across the US.

***If you enjoyed this post, you might also like:***
**ELM Trends: Corporate Legal Continues Law Firm Consolidation**

        

Tagged with:   ELM TRENDS REPORT    ENTERPRISE LEGAL MANAGEMENT    LAW FIRM PRICING    LEGAL INDUSTRY STUDY

## ABOUT FRANK STRONG



Frank Strong is the communications director for the LexisNexis software division located on NC State's Centennial Campus in Raleigh. In this capacity, he leads communications efforts in support of software products for law practice and law department management and also litigation tools – across large law, small law and corporate counsel segments. With more than 15 years of experience in the high-tech sector, Strong previously served as director of public relations for Vocus, which developed marketing, PR and media monitoring software. He has held multiple roles both in-house with corporations, ranging from startups to global organizations, and has also endured the rigors of billable hours, having completed gigs at PR firms including the top 10 global firm Hill & Knowlton. A veteran of two year-long deployments, Strong has concurrently served in uniform in reserve components of the military for more than 20 years, initially as an enlisted Marine and later as an infantry officer in the Army National Guard. Strong holds a BA in Film and TV production from Worcester State University, an M.A. in Public Communication from American University, and an M.B.A. from Marymount University. He is a PADI-certified Master Scuba Diver and holds a USPA "B" skydiving license.




## RELATED ARTICLES

### RECENT POSTS

Perfect Attendance: Q&A with a CounselLink Conference Veteran

CLOC 2019 Recap

Workloads Are Increasing. Is Your Legal Department Keeping Up?

My First LMA Conference: Relationships Matter

Build Your Business Blueprint Before Deciding On The Finishes Of Your Law Firm | Part One of Seven

### TAG CLOUD

business of law cloud security corporate counsel corporate legal budgets corporate legal department corporate legal trends CounselLink eDiscovery ELM trends report firm manager friday share general counsel interaction Juris law cloud law firm billing law firm business development law firm crm law firm management law firm marketing law firm practice management law firm profitability law firm strategy law firm technology legal department operations legal industry predictions legal industry study legal infographics legal IT legal marketing legal operations legal spend legal technology legal trade shows litigation tools LTNY pclaw product updates small law business solo attorney techshow time matters top 10 voice of customer webinars

Case 2:16-cv-04839-GW-AGR    Document 181-2    Filed 02/12/21    Page 40 of 40   Page ID #:6174


**CounselLink**
CONFERENCE
#CounselLinkCon19




CounselLink
CLOC 2019 Vegas Institute

Perfect Attendance: Q&A with a CounselLink Conference Veteran

June 26, 2019

CLOC 2019 Recap

June 13, 2019

Workloads Are Increasing. Is Your Legal Department Keeping Up?

May 8, 2019

## Trackbacks

*Ten Things: Effectively Managing Outside Counsel Spend | Ten Things You Need to Know as In-House Counsel* says:
January 22, 2015 at 8:26 am
[…] metrics you can also pull from court fee requests available on PACER or you can buy data about average hourly rates by city by type of work from several sources. With that background, here are some […]

## FIND OUT MORE

This blog is maintained by the LexisNexis Business of Law Software Solutions. It is dedicated to developing software that helps professionals at law firms and legal departments of all sizes manage the business of their law practice or departments with a suite of web and mobile solutions for customer relationship management (CRM), time and billing management, matter management, client analytics and more.

## CONTACT US

Email: blsssocial@lexisnexis.com
Tweet us: @LexisNexisLegal
Join us on Facebook
Find us on Google+

## OUR SOLUTIONS

LexisNexis® InterAciton
LexisNexis® Law Firm Practice Management
LexisNexis® CounselLink®

Copyright © 2018 LexisNexis. All rights reserved.

🔊 f 🐦 in   www.lexisnexis.com